IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

Thomas Baltrusaitis
Guillermo Antunez
Patrick Barth
Richard Broecker
Angela Bucher
Ryan Budek
William Byrwa
Tuyen Chu
Darryl Craig
Bill Davis
Satish Doshi
John Fletcher
Emory Gasperak
Jon Hutchinson
John Janssen
Alan R. Jarzembowski
Frank Kotsonis
Sandra D. Lange
Arthur Laurin
Kevin Luczak
Gino J. Mangino
Tim Mauro-Vetter
Reginald McIntyre
Carl Oberndorfer
Jerome Peacock
Ejaz Rahman
Charlie Rickman
Mark Rosinski
Greg Ryntz
Michael Savosky
Brian Schiffman
Fred Schnell
Mark Skelly
Gregory Skonieczny
Lisa Sowinski
Suraj Tandon
Chance Tess

Case No.:

JUDGE:

COMPLAINT WITH JURY DEMAND

Cahlos Tuitt )
James Viriglio
Ray Wan )
Brian Warda
Corey Watkins )
Danny Woodruff
Harold Wright )
James A. Yarch
Joan Zell )
James Ziemianski

Plaintiffs, )

-vs- )

International Union United )
Automobile, Aerospace and
Agricultural Implement )
Workers of America
8000 East Jefferson Ave. )
Detroit, MI 48214

and )

FCA US, LLC )
(formerly Chrysler Group, LLC)
1000 Chrysler Drive )
Auburn Hills, MI 48326

and )

ALPHONS IACOBELLI )
1749 Picadilly Court
Rochester Hills, MI 48309 )

and )

JEROME DURDEN )
761 Loggers Circle
Rochester, MI 48307 )

and )

MICHAEL BROWN )
4402 Gateway Circle, Apt. 16
West Bloomfield, MI 48322 )

and )

DENNIS WILLIAMS )
24455 Crestley Dr.
Corona, CA 92883 )

and )

GARY JONES )
P.O Box 393
Corsicana, TX 75151 )

and )

NORWOOD H. JEWELL )
9261 Star Ct.
Swartz Creek, MI 48473 )

and )

VIRDELL KING )
15469 Ashton Rd.
Detroit, MI 48223 )

and )

NANCY A. JOHNSON )
5775 Lakeview Street
Detroit, MI 48213 )

and )

KEITH MICKENS )
16701 Woodingham Dr.
Detroit, MI 48221 )

)

JOHN DOE 1-10 )

)

Defendants. )

INTRODUCTION

1. This is a "civil RICO" and "hybrid 301" lawsuit filed by numerous employees and former employees of FCA US, LLC, who work or worked as engineers in Detroit and are or were members of the United Auto Workers union. They are suing FCA, the UAW and several individual officials of both organizations for engaging in a pattern of racketeering by conspiring in a bribery scheme to defraud plaintiffs out of wages and benefits, and they are also suing FCA and the UAW for violations of federal labor laws.

2. This lawsuit arises under 18 U.S.C. Section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....", and 18 U.S.C. Section 1962 (d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

3. This lawsuit is also being brought pursuant to Section 9(a) of the National Labor Relations Act, 29 U.S.C. Section 159(a), Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185, and 28 U.S.C. Section 1337.

4. The NLRA/LMRA ("hybrid 301") part of this lawsuit is being brought within the six-month statute of limitations provided in 29 U.S.C. Section 160(b), considering that the statute of limitations was tolled during the period when plaintiffs pursued internal union

remedies, and was additionally tolled due to concealment and misrepresentation by the union defendants. This Complaint is also brought pursuant to 29 U.S.C. Section 159(a) which does not have an administrative exhaustion requirement and does not have a six-month statute of limitations, and 18 U.S.C. Section 1962, which also does not have an administrative exhaustion requirement and which has a four-year statute of limitations.

5. At all relevant times, each defendant was a "person" within the meaning of 18 U.S.C. Section 1961(3), because each defendant was "capable of holding a legal or beneficial interest in property."

6. Defendants operated as, or participated in an enterprise for the common purpose of directing funds away from FCA and others for the benefit of certain UAW officials in return for benefits, concessions and advantages to FCA as alleged herein, and to the detriment of plaintiffs, through fraudulent schemes and a pattern of racketeering activity, as defined in 18 U.S.C. Section 1961(5). They did so by, among other things, illegally manipulating the collective bargaining and grievance processes and diverting funds from the National Training Center and other FCA funds for the benefit of UAW officials.

7. Each defendant participated in the operation by making decisions on behalf of the enterprise and/or carrying out the decisions of the enterprise, including by directing, authorizing, receiving or concealing improper payments and/or by impacting the collective bargaining and/or grievance processes. Each defendant

committed at least two acts of racketeering activity as identified below; the multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, and were long-running and therefore constitute a "pattern of racketeering activity."

PARTIES

8. Plaintiffs are 47 current and former engineers employed by defendant FCA US LLC ("FCA") in the former Advance Manufacturing Engineering Powertrain (AMEPT) division, which is now known as the EMEC Department. Currently plaintiffs work or worked at the Trenton Engine Complex (TEC) located in Trenton, Michigan. They are members of Unit #25 and are represented by UAW Local 412.

9. Defendant FCA US, LLC ("Chrysler") is the successor corporation to Chrysler Group, LLC, and is the employer of all plaintiffs. FCA US, LLC means, collectively, FCA US, LLC, its parent FCA NV, along with their predecessors, including FCA predecessors, Chrysler LLC and Chrysler Group LLC and FCA NV predecessor Fiat S.p.A. This defendant will be referenced as Chrysler or FCA. Defendant FCA is located in Auburn Hills, Michigan.

10. Defendant UAW International is a labor organization and the bargaining representative of the employees of Chrysler, including plaintiffs. Defendant UAW International is located in Detroit, Michigan.

11. Defendants Iacobelli, Durden, Brown, Williams, Jones, Jewell, King, Johnson and Mickens, along with John Does 1-10, were, at all relevant times, officials within either FCA or the UAW who were involved in the criminal conspiracy to defraud plaintiffs by engaging in a bribery scheme. The identities of the John Does could not reasonably be ascertained by plaintiffs but will be identified and properly served as appropriate.

## JURISDICTION AND VENUE

12. This Court has federal question subject matter jurisdiction over this action under 28 U.S.C. Section 1331, and pursuant to the civil RICO statutes, 18 U.S.C. Sections 1962 and 1964 and pursuant to Section 9(a) of the National Labor Relations Act, 29 U.S.C. Section 159(a), Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185, and 29 U.S.C. Section 1337. This Court has subject matter jurisdiction over plaintiffs' state law claims as a matter of supplemental jurisdiction under 28 U.S.C. Section 1367.

13. Venue in this district is proper under 28 U.S.C. Section 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this district, and under 18 U.S.C. Section 1965 because one or more of the defendants have an agent or transact their affairs in this district.

FACTS

14. Plaintiffs are current and former engineers employed by FCA US LLC in the former Advance Manufacturing Engineering Powertrain (AMEPT)division, which is now known as the EMEC Department. Currently plaintiffs who are still employed by FCA work at the Trenton Engine Complex (TEC) located in Trenton, Michigan or elsewhere in Michigan. They are members of Unit #25 represented by UAW Local 412.

15. On September 26, 2011, then-FCA Vice President of Employee Relations Alphons Iacobelli wrote a letter to then Vice President and Director-UAW Chrysler Department General Holiefield. Iacobelli's letter said that in accordance with Section 57 of the 2007 UAW-Chrysler Engineering Office and Clerical Agreement (the National Agreement), FCA intended to transfer the work performed by the AMEPT division at the Chrysler Technical Center (CTC) located at FCA's company headquarters in Auburn Hills, Michigan to the TEC in Trenton, Michigan.

16. As a result, members of Local 412, Unit #53 would be transferred to UAW Local 412, Unit #25. The letter indicated that Unit #53 would be transferred "in its entirety." The transfer process was to begin by the end of the third quarter of 2011. The letter cited a number of efficiencies it expected to realize as a result of the transfer of operations.

17. Section 57 of the 2007 National Agreement, entitled "Transfer of Operations," provides that when operations are

transferred from one represented seniority group to another, the Company "will determine the number of additional employees, if any, the receiving seniority group will need to perform the transferred operations." Employees not wishing to transfer may exercise their seniority within their current seniority group. Section 57(b) requires that the Company provide notice and confer with the union regarding the advisability of transfer of employees impacted by the transfer of work. This was never done, in violation of the contract.

18. In the event the parties are unable to reach agreement, Section 57(c) sets forth default rules to govern the order in which employees are offered the opportunity to transfer. The 2007 National Agreement also contains a management rights clause which provides that the "Corporation has the exclusive right to manage its plants and offices and direct its affairs and working forces, except as limited by the terms of" the National Agreement.

19. The Company began the transfer of AMEPT operations in 2011. Plaintiffs were unhappy about the transfer because it added significant time to their daily commutes, approximately an hour each way, in addition to the increased fuel costs and vehicle wear and tear. Transferred employees also did not receive a relocation allowance because the National Agreement only provided for such payment when the transfer location was 50 or more miles away from the prior work location.

20. Soon after the transfer began, plaintiffs became aware that the transfer provisions of the collective bargaining agreement

were being violated; other employees within their unit were continuing to work out of the CTC, only rarely reporting to the TEC in Trenton, if at all. Most of the AMEPT management employees continued to work almost exclusively from the CTC. Some supervisors and some engineers would find excuses to report to the CTC or simply "camp out" in conference rooms with the explicit or tacit approval of their managers, who also preferred working from the CTC. In some instances, employees within the transfer group would work from the offices of suppliers located near the CTC to avoid commuting to Trenton. Plaintiffs believed it was unfair that some employees, most of whom lived a short distance from the Auburn Hills headquarters, were being required to report to Trenton, more than 50 miles away, while others continued to work primarily from the CTC or nearby locations, especially since those who avoided the long commute to Trenton had more time available to work overtime assignments.

21. As early as 2012, plaintiffs complained to the Company's Human Resources department about the uneven treatment of employees within the transferred unit and that the transferred employees should have received a relocation allowance. At various points, the Company committed to enforcing the transfer equally, even agreeing to cancel badge access to the CTC for employees in the transfer group. However, by information and belief, the Company never acted on this matter.

22. Plaintiffs were also unhappy with the use of pool cars located at the CTC. Transferred employees preferred to use pool

cars located at the CTC for weekend overtime assignments at nearby plants. Some managers permitted Trenton-based employees to use the CTC pool cars while others would not allow the practice. In addition, some employees used the CTC pool cars even during the work week in order to avoid reporting to Trenton. The issue of the location and access to pool cars was raised by the union during local contract negotiations in 2013, but no resolution was reached.

23. In addition, as early as 2013, plaintiffs and others noticed what they believed to be an increase in the number of non-bargaining unit (NBU) employees doing bargaining unit work. They attributed this increase to the transfer. The number of salaried bargaining unit (SBU) employees within the AMEPT group decreased as a result of the long commute to Trenton and low morale attributable to unequal implementation of the transfer.

24. In 2014, the Company formed the "Advanced Planning Group" at CTC, also referred to as the "Strategic Planning Group." Non-bargaining unit employees in this group began to perform work traditionally performed by plaintiffs, and plaintiffs filed several grievances relating to the Advanced Planning Group in 2014 and 2015.

25. Between 2012 and 2015,union leadership was not responsive to concerns raised by plaintiffs relative to the transfers. Unit #25 took company-friendly positions on a number of issues. Specifically, the then-existing Unit leadership ignored plaintiffs' concerns regarding the erosion of the SBU workforce and the reassignment of work to NBU employees. Grievances were not

properly handled, few grievances were actually presented at the first step, none were presented at the second step and many grievances filed prior to the transfer were withdrawn without precedent (WWP) by union officials with no documentation or explanation. By information and belief, prior local union leadership enjoyed privileges such as increased access to overtime as a result of their acquiescence to management in union matters.

26. In June, 2015, new leadership took office for Unit #25. In the same month, the National Negotiating Term reached out to the new unit leadership to determine what issues from the group should be forwarded in the national negotiating process. Several grievances regarding the transfer of work to the Advanced Planning Group were submitted to the National Negotiating Team, but there was no disposition to the grievances nor any accounting for this issue in the new collective bargaining agreement.

27. In 2015, plaintiffs filed grievance 15-25-001 regarding the 2011 transfer of operations. That grievance sought payment of $30,000 for each affected employee under the National Agreement's Relocation Allowance Plan. This grievance was not pursued by the union beyond the second step.

28. On August 2, 2017, plaintiffs filed grievance 17-25-001, on behalf of all employees in the transferred group. The grievance claimed a violation of the "Purpose and Intent" of the National Agreement. The grievance stated:

> The entire EMEC SBU workforce has been damaged with the illegal 'Transfer of Operations' that took place back on November 11th, 2011. FCA colluded with the UAW and created the illegal

> Transfer of Operations [which] was executed by the company with the full support of corrupt UAW officials. The collusion between FCA and the UAW not only violated Labor Law, it has damaged all SBU employees of EMEC....
> After the AMEPT SBU engineers were forced to move due to the Transfer of Operations, management created the 'Strategic Planning Group' in the area that was vacated by the AME PT engineers. Now NBU employees are doing traditional EMEC SBU engineering work.

29. The grievance sought $172,800 payable to 55 EMEC employees to compensate for additional daily commuting time, as well as a $45,000 car voucher per employee to compensate for added mileage placed on their vehicles. The grievance also requested that employees be relocated back to CTC and the return of all work traditionally performed by SBU employees.

30. The allegations of collusion contained in the grievance were based on the government's indictment of Alphons Iacobelli on July 26, 2017 for violation of federal labor law and tax evasion.

31. As the Public Review Board stated:

> The essence of Appellants' claim is that the Company avoided complying with its contractual obligations by unlawfully obtaining the acquiescence of certain Union officers and as a result deprived the Appellants of the benefit of these contractual provisions. Such a claim states a contract violation.
> ***********
> Iacobelli's indictment and subsequent plea agreement indicate that illicit payments to Holiefield and others occurred during the time period relevant to the transfer. Significantly, the Company provided notice of the transfer in a letter from Iacobelli to Holiefield. It may be that this letter was signed and addressed by these men in their official capacities and that they had no personal involvement in matters related to the transfer. But at this point, there is nothing

> in the Record to establish who was involved in the transfer on behalf of the Company and the Union. Under the circumstances as currently known, it does not seem improbable that Iacobelli and Holiefield were personally involved. The transfer involved a substantial number of employees, approximately 200. The Company also announced the transfer just as negotiations for the 2011 National Agreement were wrapping up, when presumably principals on both sides were in frequent contact.
>
> Appellants' allegation that fraud or collusion tainted the transfer of operations is also bolstered by the evidence that they have presented indicating that the Company did not transfer Appellants' unit "in its entirety," as initially announced. The Record materials submitted by Appellants clearly indicate that many management employees and even some SBU employees continued to work at CTC....the fact that NBU employees and others did not actually transfer lends credence to Appellants' claim based on Iacobelli's plea agreement that the transfer was the product of fraud and collusion, as opposed to a bona fide operational change motivated by considerations of efficiency.
>
> Public Review Board Decision, January 22, 2020 at 16, 17-18.

32. The indictment of Iacobelli was the first public acknowledgment by either FCA, the UAW or the federal government, that the government was investigating anyone in FCA and/or the UAW for what would later blossom into a scandal in which it was revealed that from about 2009 until the Iacobelli indictment was made public in 2017, high-level FCA officials had been paying bribes to UAW officials in exchange for the UAW negotiating company-friendly contracts and acting in the company's interests on grievances. It was also the first information plaintiffs had that their complaints and grievances had been affected by bribery

between FCA and the UAW.

33. The Company answered that the grievance was untimely because the transfer occurred in 2011 and that it lacked merit because the transfer was conducted in accordance with the National Agreement. Plaintiff Baltrusaitis progressed the grievance to Step 2, but the Company gave the same response and also asserted that the grievance was the same as the one filed in 2015.

34. At the next stage in the process, UAW Region 1 International Representative Thomas Brenner withdrew the grievance. Plaintiffs were notified of the withdrawal by letter dated November 3, 2017.

35. On December 8, 2017, plaintiffs filed an appeal with the International President, which was ruled untimely. Plaintiffs did not seek to appeal the International President's determination regarding timeliness.

36. On February 2, 2018, plaintiffs filed grievance 18-25-001, on behalf of all employees in the transferred group. The grievance claimed a violation of the "Purpose and Intent" clause of the National Agreement. The grievance stated:

> The EMEC SBU workforce has been damaged by the actions of an FCA executive who violated the Labor Management Relations Act and who also paid off UAW official(s) 'to take company-friendly policies.' One such policy was the 'Transfer of Operations' that took place back on November 11th, 2011. FCA illegally influenced UAW officials(s) with monies, which led to the questionable Transfer of Operations of Unit #53 from CTC to Unit #25 at TEC. After the AME PT SBU engineers were forced to move due to the Transfer of Operations, management created the 'Strategic Planning Group' in the area that was vacated by the AME PT engineers.

> Now NBU employees are doing traditional SBU engineering work, work once done by SBU Unit #53 engineers. The illegal actions of the FCA executive was verified in January-2018 when news articles came out saying that the executive pled guilty to criminal charges....

37. The grievance sought essentially the same relief as grievance 17-25-001.

38. The Company answered that the grievance was similar to 17-26-001, which had been withdrawn, and also lacked a contractual basis.

39. Unit #25 forwarded the grievance to UAW Region 1 and a Step 2 grievance meeting was held on August 7, 2018. By letter dated August 27, 2018, International Representative Brenner advised Unit #25 that the grievance had been withdrawn.

40. On September 24, 2018 the plaintiffs appealed the withdrawal of grievance 18-25-001. In support of their appeal, plaintiffs submitted voluminous documentation to the International UAW. Plaintiffs emphasized that on December 15, 2017, Iacobelli had pled guilty to providing prohibited payments to Holiefield, whereas the allegations of collusion in grievance 17-25-001 had been based solely on the government indictment of Iacobelli.

41. On February 7, 20119, the International Executive Board rejected plaintiffs' appeal.

42. On February 24, 2019, plaintiffs appealed the withdrawal of the grievance to the UAW's Public Review Board, the last step in UAW's internal appeal process.

43. On December 14, 2019, the PRB held oral argument.

44. On January 22, 2020, the PRB issued a ruling which stated

that plaintiffs "have made a sufficient showing that fraud or collusion could have impacted the 2011 transfer of operations to warrant further investigation," and ordered the UAW to provide additional documentation and information concerning the union's defenses to the plaintiffs' claims that fraud and collusion affected the 2011 transfer decision and the implementation of that decision.

45. On May 6, 2020, the PRB issued a final ruling. That ruling said that the UAW's response to the PRB's request for additional information "fails to provide sufficient information to rebut Appellants' threshold showing in this matter." The PRB declared that plaintiffs had "discharged their obligation to exhaust internal union remedies under Article 33, Section 5 of the UAW International Constitution" and "may proceed with any external processes or remedies available to them."

46. Unbeknownst to plaintiffs at the time when plaintiffs were transferred in 2011, or when they complained to the company about uneven implementation of the transfer process in 2012, or when they complained repeatedly to their union leadership, or when they watched as grievances were not properly handled, or when they filed a grievance in 2015, high-level officials at Chrysler and the UAW were engaging in a wide-ranging, long-lasting criminal bribery scheme aimed at saving Chrysler millions of dollars by having the union take company-friendly positions, i.e., interpreting contractual language in a way that deprived Chrysler employees, like plaintiffs, of fair representation and derailing the exact

type of grievances that plaintiffs were attempting to bring.

47. Beginning in July, 2009, FCA began this scheme of improper payments to UAW officials, funneled through the Chrysler-UAW National Training Center (NTC), made by FCA senior executives and agents including with the knowledge and approval of then-FCA CEO Sergio Marchionne (now deceased). All such payments were made willfully and with the intent to benefit the UAW and its officials to influence the collective bargaining and/or grievance processes, as alleged herein. FCA and its agents used and directed the use of the mails and wires to further this fraudulent scheme in violation of 18 U.S.C. Section 1341 and 1343.

48. Also unbeknownst to plaintiffs at the time they complained to union officials and filed their grievances, the United States Attorney for the Eastern District of Michigan, the FBI and the United States Department of Labor were conducting an investigation into corruption by and between Chrysler and the UAW.

49. This investigation was first revealed when the first of numerous indictments and plea agreements were publicly revealed in July, 2017, but the fact that UAW and FCA officials had engaged in a bribery scheme was known to FCA and UAW officials as early as 2009, when the scheme began, and the fact that the bribery was being criminally investigated was known to FCA and UAW no later than April, 2016 and was concealed from the plaintiffs.

50. According to indictments and plea agreements filed in the bribery scandal criminal cases, starting in approximately July, 2009, Chrysler paid millions of dollars in "prohibited payments and

things of value to UAW officers and UAW employees" through the UAW-FCA joint training center and in return, received "benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."

51. These payments were "viewed...as an investment in 'relationship building' with UAW Vice President [General] Holiefield," according to the indictment of Alphons Iacobelli, the Vice President of Employee Relations at Chrysler at the time of the bribery scandal. U.S. v. Iacobelli, E.D. Mich., Case No. 17-20406, Docket #4 at 13.

52. On January 22, 2018, Iacobelli pleaded guilty to paying $1.5 million in bribes to several UAW officials in exchange for those officials going easy on the company in union contracts and grievances. This guilty plea, along with guilty pleas by several UAW officials, is part of an ongoing FBI and U.S. Department of Labor corruption investigation of the "big three" automakers and the UAW, corruption that has potentially victimized tens of thousands of innocent UAW members, including the plaintiffs in this case.

53. Specifically, Iacobelli pleaded guilty to criminal charges involving conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371. Iacobelli was the Vice President for Employee Relations at FCA. In that capacity, he was "FCA's lead representative for labor relations and had lead responsibility for managing FCA's relationship with the UAW.

Alphons Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW, including the resolution of disputes and grievances that arose under the collective bargaining agreements between FCA and the UAW," according to his plea agreement.

54. Iacobelli admitted that "[b]etween in or before January 2009 and continuing through in or after June 2015, Alphons Iacobelli knowingly and voluntarily joined a conspiracy in which Fiat Chrysler Automobiles US LLC and its executives agreed to pay and deliver, and willfully paid and delivered, more than $1.5 million in prohibited payments and things of value to officers and employees of the UAW." U.S. v. Iacobelli, Plea Agreement at 3.

55. These bribes were authorized by FCA's then CEO Sergio Marchionne (now deceased) to General Holiefield, the UAW Vice President and International Executive Board Member (now deceased) who oversaw the FCA business relationship. FCA executive Iacobelli has admitted to this scheme and currently is in prison for these illegal acts. Michael Brown, Director of Employee Relations at FCA and Co-Director of the National Training Center, likewise has admitted to this scheme.

56. According to the plea agreement, over the course of the conspiracy, Iacobelli, along with an unnamed FCA Director, an unnamed FCA Senior Manager, FCA Financial Analyst Jerome Durden and other FCA executives and employees, unlawfully paid and delivered more than $1.5 million in prohibited payments and things of value

directly and indirectly to UAW Vice President General Holifield, UAW Assistant Director Virdell King, three unnamed UAW officials "and other UAW officials." U.S. v. Iacobelli, Docket #58, Iacobelli Plea Agreement at 6.

57. Those payments and things of value included paying off the mortgage on the personal residence of a UAW Vice President, personal travel, designer clothing, cases of custom-labeled wine, furniture, jewelry, and custom-made watches. Iacobelli Plea Agreement at 6. These and other payments described in the plea agreement were delivered to UAW officials and UAW employees "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." Plea Agreement at 7.

58. According to the Iacoballi indictment, FCA and its executives, with the knowledge and approval of FCA, made these payments to keep UAW officials "fat, dumb, and happy" and to "buy labor peace." Iacobelli Indictment at 16.

59. According to federal prosecutors, "FCA, through Iacobelli and its executives, was implementing a corporate policy to buy good relationships with UAW officials. As one FCA executive put it, FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the National Training Center, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW." Iacobelli Gov't Sentencing Mem., Docket #132 at 8.

60. As Michael Brown, FCA's Director of Employee Relations and NTC Co-Director admitted, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials." Brown Plea Agreement, at 4.

61. To minimize detection of the payments, FCA had the NTC provide the bribes to various UAW officials through a variety of deceptive means and methods. The bribes violated the Taft-Hartley Act, 29 U.S.C. Section 186 and were concealed through acts of mail and wire fraud, all constituting predicate acts of racketeering within the meaning of 18 U.S.C. Section 1961(1).

62. For example, UAW Vice President Holifield used his personal charity, Leave the Light on Foundation (LTLOF), as one means to conceal his receipt of FCA bribes. Between July, 2009 and 2014, Holiefield and his hand-selected LTLOF board members (which included defendant FCA executive Jerome Durden and defendants UAW officials Keith Mickens and Virdell King) transferred more than $386,000 in funds from the NTC to LTLOF. Holiefield and his team hid these transfers by improperly omitting them from the Form 990s the NTC and LTLOF filed with the IRS. In turn Holiefield, along with his girlfriend (and later wife), Monica Morgan, used the purported charitable donations for personal expenditures.

63. On other occasions, the NTC would directly pay the personal expenses of certain UAW officials, such as a wire transfer from the NTC that paid off the mortgage on Holiefield's personal residence in the amount of $262,219.71.

64. FCA also made use of credit cards issued to UAW

officials, with statements sent through the U.S. mails and payments made in part using interstate wires, so that UAW officials could charge personal expenses that were paid by FCA. Iacobelli "directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions," according to the Virdell King Information (at 11).

65. By information and belief, among the "company-friendly positions" that the UAW and its officials took in exchange for receiving bribes from FCA was the UAW's allowance, with no resistance, of the transfer of plaintiffs from Auburn Hills to Trenton, the lax and uneven enforcement of the transfer based on favortism toward certain employees, the handling of plaintiffs' complains and grievances, failure to take any action when non-bargaining unit employees took work from bargaining-unit members such as plaintiffs and the failure to take any action when the transfers were administered unfairly.

66. Defendant Norwood Jewell was a member of the UAW Executive Board from 2011 to 2017, most recently as UAW's vice president of the FCA Department beginning in June, 2014 until 2017 and previously as a Regional Director (2010-2014), and co-chair of the National Training Center.

67. By information and belief, under Jewell's leadership, the UAW withdrew, ignored or short-shrifted plaintiffs' grievances and complaints about the transfers, the use of non-bargaining unit employees and the uneven administration of the transfers, based on the fact that Jewell and other UAW officials were taking bribes

from FCA at the time plaintiffs' issues were pending.

68. Jewell later admitted under oath that between 2014 and 2016 he joined the conspiracy whereby UAW officials accepted things of value from FCA executives acting in the interest of FCA. He admitted that as part of that conspiracy, executives from FCA made prohibited payments of things of value, including travel, lodging and meals, delivered through and concealed by the National Training Center, with the intent to benefit the UAW, other senior UAW officials or himself when the UAW, the other UAW officials and Jewell were not lawfully allowed to accept such things of value under the Labor Management Relations Act.

69. Jewell admitted in his Plea Agreement that between 2009 and 2016, during which time General Holiefield (2009-2014) and he (2014-2016) were the vice presidents of the UAW in charge of the Chrysler Department,

> FCA executives conspired with one another, with FCA, with officials at the UAW, and with the UAW, to violate the Labor Management Relations Act....[They] knowingly created and/or joined the conspiracy whereby officers and employees of the UAW would willfully request, receive and accept money and things of value from persons acting in the interest of FCA. During the Holifield leadership years, a 'culture of corruption' was continued and enhanced between Holiefield, his staff, and executives of FCA to violate the Labor Management Relations Act....From 2014 through 2016, while serving as a vice president of the UAW in charge of the Chrysler Department, Norwood Jewell knowingly joined the conspiracy whereby officers and employees of the UAW would willfully request, receive and accept things of value worth over $40,000 from persons acting in the interest of FCA by failing to apportion the amounts attributable to the UAW, the NTC, and to Norwood Jewell

> personally. The things of value included travel, lodging and meals....Norwood Jewell, then a representative, officer and vice president of the UAW, knowingly and voluntarily joined this conspiracy to receive things of value from persons acting in the interest of FCA. Norwood Jewell joined knowing that the prohibited payments of things of value, which were delivered through and concealed by the UAW-Chrysler National Training Center (NTC), were willfully made with the intent to benefit the UAW, Norwood Jewell, senior UAW official Nancy A. Johnson, senior UAW official Virdell King, Keith Mickens, and other senior UAW officials, who were not permitted to receive things of value.
>
> U.S. v. Jewell, E.D. Mich. Case No. 2:19-cr-20146, Docket #10, Rule 11 Plea Agreement at 2-4.

70. According to the United States Attorney's Sentencing Memorandum in Jewell's case, Jewell "made the conscious and criminal decision to participate in the conspiracy and to bask in the culture of corruption."

71. Norwood Jewell pleaded guilty to one count of conspiracy to violate the Labor Management Relations Act, in violation of 18 U.S.C. Section 371, and was sentenced to fifteen (15) months in prison in 2019. The overt acts for which he pleaded guilty were occurring at the exact same time that he was overseeing the union's response to plaintiffs' issues stemming from the transfer.

72. In reality he was accepting bribes at that time, the purpose of which was to do FCA's bidding in regards to grievance handling and contract negotiations, rather than doing the bidding of plaintiffs and other UAW members.

73. The issues raised by plaintiffs, which UAW officials

encouraged plaintiffs to bring to the attention of UAW bargaining unit officials, never became a part of the 2015 CBA and, by information and belief, were not even raised by the UAW bargaining committee to FCA during negotiations. This was all in furtherance of the bribery scheme and the pattern of racketeering to which Jewell and other UAW officials were parties.

74. In the meantime, on July 14, 2015, at the kickoff of the 2015 CBA negotiations, Jewell used a National Training Center credit card, paid for by FCA, to pay more than $7500 for an extravagant meal at a Detroit restaurant for himself and the UAW national negotiating committee. That same day, Jewell caused another $800 of FCA money to be spent for UAW officials to smoke cigars and drink liquor at the same restaurant.

75. In September, 2015, after the completion of the 2015 CBA negotiations, at which plaintiffs' transfer issues were not raised, Jewell caused another $7000 or so of FCA money to be spent at the same Detroit restaurant for Jewell and the UAW negotiating team to celebrate the new CBA with FCA. During the time period of 2014-2016, when the UAW was looking the other way on plaintiffs' grievances and complaints and fighting them at every step in their attempts to have their grievances heard and remediated, Jewell was continuing the "culture of corruption" started by Holiefield by accepting bribes from FCA, and funneling meals, travel, alcohol and other things of value to other UAW officials, all to the detriment of plaintiffs and as part of the conspiracy by FCA and UAW and their officials to benefit FCA at the direct expense of plaintiffs,

who were the intended targets of the scheme.

76. Jewell further enriched himself with FCA money, with FCA's knowledge and encouragement, when he repeatedly used a credit card and funds provided to him as Co-Chairman of th NTC to make extravagant purchases for the benefit of himself and other high-ranking UAW officials, in violation of 29 U.S.C. Section 186.

77. Such purchases included $8,926.93 for a two-month stay at a villa in Palm Springs, California in January and February, 2016; $6,681.12 for golf, golf club rentals, golf balls, meals, beer, and liquor at the Indian Canyons Golf Resort in Palm Springs; $1,259.17 for luxury luggage; $2,182 for an Italian-made Baretta shotgun; and $468.86 for cigars at Wild Bill's Tobacco store. These purchases also included $2,130 of Disney World theme park tickets for his friend and his friend's family; multiple tickets to Universal Studios theme park for his friends at a cost of $217.26 each; and numerous extravagant dinners for himself and other UAW officials.

78. FCA not only bought the acquiescence of individual UAW officials like Holiefield and Jewell; FCA also bought the entire UAW International Executive Board at a time when the IEB and/or individual members of the IEB, had the opportunity to make judgments on plaintiffs' grievances or the procedural aftermath of those grievances.

79. For example, in August, 2014, during the time plaintiffs were complaining to the union and to the company about the transfers, the uneven enforcement of the transfers and the increase in the use of non-bargaining unit employees doing plaintiffs' work,

Jewell hosted two lavish parties on the grounds of the National Training Center.

80. Jewell caused more than $25,000 of FCA money to be used for a decadent party to entertain the members of the IEB, including Regional Directors, other Vice Presidents and then-UAW president Dennis Williams, who was the individual ultimately responsible for the actions taken by the UAW that went against plaintiffs' interests.

81. During that party, each attendee received personalized bottles of wine, with a label that read, "MADE ESPECIALLY FOR YOU BY UAW VICE PRESIDENT NORWOOD JEWELL IN THE USA." These bottles of wine, as well as other costs of the party, were paid for by FCA.

82. In August, 2015, which was after plaintiffs had filed their grievance, Jewell hosted another party for the IEB on FCA's tab. This party was even more lavish than the 2014 party and had a "Miami Vice" theme and cost more than $31,000. This party featured "Kandy Girls," who were dressed in provocative outfits and whose role was to light the cigars of UAW bosses.

83. As the U.S. Attorney said in Jewell's sentencing memorandum:

> Jewell accepted money generously supplied by the car company with whom he was negotiating a collective bargaining agreement that would affect the wages, benefits, and working conditions of tens of thousands of workers. Rather than conduct those negotiations at arm's length, Jewell's arms were reaching towards the deep pockets of Fiat Chrysler....Jewell was not focused on zealously representing the interests of UAW members and their families. Instead, while thousands of UAW members worked hard every day

> at factories, Jewell was living the absolute high life in Palm Springs for extended periods of time in January and February of 2015 and 2016. Jewell golfed during the day and ate prime steaks at top restaurants during the night, all while living in a three-bedroom villa with a private pool and hot tub. Of course, Jewell's high-flying lifestyle was paid for by Fiat Chrysler with money funneled through the National Training Center. Jewell also used Fiat Chrysler money to send his close friends to Disney World, fly first class, and acquire brand new luggage. As for the UAW members on the factory lines across the country, their day-to-day concerns and grievances were far from Jewell's mind.
>
> U.S. v. Jewell, E.D. Mich. Case No. 2:19-cr-20146, Docket #15, Government Sentencing Memorandum at 15-16.

84. It was during this exact time frame that Jewell was presiding over the withdrawal of hundreds of union grievances, including plaintiffs' grievance and taking other company-friendly positions in exchange for the afore-mentioned bribes.

85. In between golf outings in Palm Springs and lavish parties in Detroit, during which time he was bought and paid for by Chrysler, Jewell oversaw the continuation of the culture of corruption started by General Holiefield. and then ran off to have his cigar lit by a Kandy Girl.

86. The same can be said of the other defendants and of the other bargaining issues affected by the bribes. As the U.S. Attorney said in Jewell's Sentencing Memorandum: "These men and women believed that their union leaders were looking out for their best interests and negotiating in good faith, not double dealing them for personal gain. Through their involvement in this criminal

conspiracy, however, Jewell and other senior UAW leaders were accepting corrupt payments from Fiat Chrysler and its executives. It is difficult to calculate the harm that resulted to the grievance process, the bargaining process, and labor relations generally." U.S. v. Jewell, Govt. Sentencing Memorandum at 17.

87. The plea agreement of Iacobelli acknowledges that his involvement in the bribery conspiracy lasted until June, 2015, by which time defendant UAW was in the process of burying plaintiffs' first grievance.

88. Moreover, the Jewell plea agreement acknowledges that the bribery conspiracy lasted until the end of 2016, and other evidence indicates the bribery conspiracy lasted well into 2017, by which time plaintiffs had been complaining about the transfer and its aftermath for several years without knowing of the existence of a bribery conspiracy or a federal investigation into said conspiracy; and defendant UAW had already withdrawn plaintiffs' 2015 grievance without mentioning that high-level UAW and FCA officials had been engaged in a bribery scandal that may have affected the union's handling of plaintiffs' claims.

89. Plaintiffs' complaints and grievances were either pending or had been dismissed or withdrawn, during which time UAW officials knew about the bribery scheme and knew about the federal bribery investigation and yet failed to notify plaintiffs of a bribery scheme or a pending federal bribery investigation that would have affected plaintiffs' case.

90. Throughout the time frame of 2013-2017, when plaintiffs

were complaining to company and union officials and filing grievances, throughout all of these events over a four-year period, the defendants failed to disclose that the union's positions relative to plaintiffs' claims were, at least in part, purchased through and/or influenced by bribes. The ongoing concealments were part and parcel of the defendants' ongoing conspiracy and racketeering enterprise.

91. As a result of these bribes, the union defendants were compromised and were never in a position to fully and fairly represent plaintiffs' interests as they were legally required to do, and plaintiffs were not able to receive the benefit of the true and honest union representation to which they were entitled.

92. Moreover, by virtue of the fact that the bribery scheme was intended to save FCA money and has, at least to this point, been successful at doing so, and that the money saved came at the expense of the plaintiffs, who have been deprived of their rightful benefits, plaintiffs were the primary targets of the illegal bribery scheme and the bribery scheme was the proximate cause of plaintiffs' losses.

93. Each and every one of the defendants participated in or had knowledge of the bribery scheme and larger conspiracy and/or the federal investigation into the bribery scheme and therefore are responsible as co-conspirators. Each of the individual defendants has admitted to having knowledge of and/or participation in the bribery scheme.

94. As the U.S. Attorney's office said in the Sentencing

Memorandum of Nancy Johnson, Norwood Jewell's top administrative assistant, who pleaded guilty to one count of conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371: "Instead of zealously pursuing union grievances and health and safety issues, senior officials of the UAW sought to line their own pockets with money and things of value provided to them by Fiat Chrysler."

95. At every stage of plaintiffs' case, when both the UAW and Chrysler were making decisions that were adverse to plaintiffs, Chrysler was paying and the UAW was accepting bribes to assure that the UAW would take "company friendly positions," which is exactly what happened to plaintiffs. Each of the defendants, both the corporate defendants and the individual defendants, took part in or knew about the bribery scheme and its goal of inducing the union to take company-friendly positions on CBA negotiations and the handling of grievances.

96. During the time frame of plaintiffs' grievances and appeals, the International Presidents of the UAW were Dennis Williams and then Gary Jones.

97. Williams was UAW President from 2014 to June, 2018 and he was replaced by Jones, who was president from June, 2018 to November, 2019.

98. On June, 2, 2020, Jones pleaded guilty to racketeering and embezzlement charges, and is awaiting sentencing. On September 30, 2020, Williams pleaded guilty to a single count of conspiracy to embezzle union funds, in violation of 18 U.S.C. Section 371. He

is awaiting sentencing.

99. According to the indictment of UAW official Vance Pearson, Williams was directly involved in the bribery conspiracy, in that he rented a villa in Palm Springs, California, ostensibly for the UAW's Region 5 Conference, from on or about December 25, 2014 to January 31, 2015. During that time, upon information and belief, Williams participated in or was aware of Chrysler/FCA funds being used for lavish dinners and golf outings for UAW officials in Palm Springs, including dinners and other expenditures during January, 2015.

100. In June, 2018, Gary Jones took over as union president and was the UAW official who, on February 7, 2019 and February 20, 2019, after the plea agreements of Iacobelli and others had already become public, and after the resignation of Williams in light of the ongoing bribery scandal, refused to permit plaintiffs to proceed with their appeal of the UAW's withdrawal of their grievances. Jones was also UAW international President throughout part of the plaintiffs' appeal to the Public Review Board, in which the union opposed plaintiffs' claims. By information and belief, Jones' decision on behalf of the union to oppose plaintiffs' claims and not to reveal to plaintiffs the existence of the bribery scheme and/or the federal investigation into the bribery scheme, was influenced by his knowledge of, and participation in the bribery scheme.

101. During the entire time frame between 2013 and 2018, high-level officials from both the UAW and FCA, acting on behalf of

their respective organizations, knew that bribes were being paid and received or had previously been paid and received in order to obtain labor peace, at the expense of plaintiffs and other UAW members.

102. During this same time frame and even later, both FCA and the UAW knew that the plaintiffs had been wrongfully transferred and pushed out of their positions.

103. It was the UAW International President (Gary Jones and Dennis Williams) and the International Executive Board of the UAW that had signed off on the refusal to hear plaintiffs' appeals to the President, to the International Executive Board and then to the Public Review Board from 2017-2020.

104. Almost all of these events occurred during the same time period when FCA was paying bribes to the UAW to buy labor peace and to influence labor contracts and grievances or in the aftermath of UAW officials having received those payments, when defendants knew they were under investigation by the federal government and failed to disclose it to plaintiffs. Plaintiffs, among others, were the intended targets of the bribery scheme. Some of these events occurred after FCA and the UAW were informed that their organizations and high-level individuals within their organizations were under investigation for bribery. Yet, as part of the conspiracy, neither FCA nor the UAW nor any of the individual defendants informed plaintiffs of the investigation or that the actions of FCA and the UAW in fighting plaintiffs' claims for the last eight years had been influenced by payments and acceptance of

bribes.

105. As a direct result of this conspiracy of silence, plaintiffs, in addition to having been unlawfully transferred, were not able to fully and fairly pursue either their grievance or the withdrawal of their grievances, to plaintiffs' detriment and prejudice.

106. As the Public Review Board said in its ruling:

> The [Iacobelli] plea agreement was an admission that Iacobelli had engaged in criminal conduct, specifically that he had caused unlawful payments to be made to certain UAW officials, most notably General Holiefield. The plea agreement identifies numerous 'overt acts' involving hundreds of thousands of dollars in payments or things of value to Holiefield or his girlfriend (later wife) between 2009 and 2011-2012, which were made or authorized by Iacobelli. The plea agreement further states that these and other prohibited payments and things of value were delivered in an effort to obtain 'benefits, concessions, and advantages for FCA in its negotiation, implementation and administration of the collective bargaining agreements' with the UAW for 2011 and 2015.
>
> The essence of Appellants' grievance 18-25-001 is that the 2011 transfer of operations was either the product of or tainted by Iacobelli's criminal conduct. Appellants cannot be considered reasonably aware of the existence of such a claim until Iacobelli's guilty plea was made public. Indeed, until that point, Iacobelli and others had concealed and denied the criminal conduct to which he ultimately confessed.
>
> Public Review Board Decision, January 22, 2020 at 13.

107. By information and belief, UAW and FCA leaders knew as

early as October, 2015, that the federal government was actively investigating past FCA/UAW CBAs and labor agreements. Plaintiffs had no such knowledge because FCA, UAW and its leaders, as part of the conspiracy, concealed both the fact of the bribes and the fact that the union and the company and high-level officials from the union and the company were being investigated, from the plaintiffs. All of the union's actions and the company's actions in the transfer and its aftermath are tainted by the bribery scandal.

108. Even though plaintiffs disagreed with the decisions made by the UAW in relation to their claims, they reasonably but incorrectly believed that FCA and the UAW and their officials acted in good faith and at arm's length.

109. Secrecy and concealment of the bribery scheme were vital to its' success. Had defendants revealed the existence of the bribery scheme to plaintiffs (or to anyone), it would have resulted in criminal indictments much earlier than was eventually the case, and it would have afforded plaintiffs the opportunity to have more fully explored the extent to which the bribes were influencing the defendants' decisions in the internal union procedures.

110. Instead, defendants, as part of the conspiracy, took active measures to conceal the existence of the bribes, including but not limited to, failing to reveal the existence of the bribery scheme and the federal investigation into the bribery scheme during all phases of plaintiffs' complaints, both informal and formal. This ongoing conspiracy of concealment was successful, in that plaintiffs went through the initial grievance process and internal

appeals before the first public acknowledgment was made by the federal government (not the defendants) of the existence of the bribery investigation and scheme.

111. Even when the first federal indictments were made public in July, 2017, FCA and the UAW continued to take active steps to conceal and minimize the scheme. In 2017 and 2018, FCA and UAW President Williams issued public statements downplaying the federal indictments and attributing the bribes to a few "bad actors."

112. The public statements of UAW and FCA continued to claim that FCA and UAW were victims and that neither the company nor the union knew of or sanctioned the criminal acts alleged and further, that the illegal conduct of these "bad actors" had nothing to do with the collective bargaining process.

113. In fact, both UAW and FCA had been aware of the criminal acts, both because their highest-level executives were participating in the conspiracies and because by July, 2017, both the company and the union had known about the federal investigations for at least two years prior to the announcement of the first set of indictments in July, 2017. And both FCA and the UAW knew that the bribes had a direct effect on the collective bargaining process, including the handling of plaintiffs' transfer and grievances, because that was what the bribes were specifically intended to affect.

114. Plaintiffs could not have reasonably discovered this information earlier, because of defendants' ongoing effort to conceal the existence of the bribery scheme.

115. The withdrawal of the grievances, which saved the company millions of dollars, is just the kind of company-friendly positions that the Iacobelli bribes were intended to purchase.

116. By information and belief, the withdrawing of plaintiffs' grievances, as well as the union's on-going attempts to thwart plaintiffs' attempts to seek redress through union procedures, was done for corrupt purposes as part of the conspiracy that began in 2009.

117. Since the Iacobelli plea agreement was made public, numerous other FCA and UAW officials have been indicted and/or pleaded guilty to charges stemming from the same or other bribery schemes.

118. For example, Jerome Durden, who was a financial analyst at Chrysler and FCA and who was Controller of the NTC and Secretary of the NTC Joint Activities Board and Treasurer of General Holiefield's Leave the Light on Foundation until 2015, pleaded guilty on August 8, 2018 to failure to file tax returns, 26 U.S.C. Section 7203, and conspiracy to defraud the U.S., 18 U.S.C. Section 371 for acts related to the bribery scheme, and was sentenced to 15 months in prison.

119. Michael Brown was the Director of Employee Relations at Chrysler and FCA from 2009 to 2016. In that capacity, by information and belief, Brown was personally involved in the negotiations and administration of the national CBAs between FCA and the UAW and had authority to sign letters and agreements on behalf of FCA with the UAW. Brown also represented FCA as Co-

Director of the NTC. On May 25, 2018, Brown pleaded guilty to misprision of a felony, 18 U.S.C. Section 4 for his role in the bribery scheme, and was sentenced to one year and one day in prison.

120. Norwood Jewell served on the UAW's executive board from 2011 to 2017, including serving as UAW's Vice President of the FCA Department from 2014-2017. He also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for his role in the bribery scheme and was sentenced to fifteen (15) months in prison.

121. Virdell King was a senior official in the UAW Chrysler Department from 2008 until she retired in February, 2016. On August 29, 2017, she pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for her role in the bribery scheme and was sentenced to sixty (60) days in prison.

122. Nancy Johnson was the top administrative assistant to Norwood Jewell when Jewell was the UAW Vice President for the Chrysler Department, from 2014-2016. On July 23, 2018, Johnson pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for her role in the bribery scheme, and was sentenced to one year and one day in prison.

123. Keith Mickens was a senior official in the UAW Chrysler Department from 2010 through 2015. Mickens served as Co-Chairman of the NTC and served on the NTC Joint Activities Board. On April

5, 2018, Mickens pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 271 for his role in the bribery scheme, and was sentenced to one year and one day in prison.

124. Former UAW International President Gary Jones pleaded guilty on June 3, 2020 to one count of conspiracy to embezzle union funds and to use facilities of interstate commerce to aid racketeering activity, and conspiracy to defraud the United States, in an embezzlement scheme that is only partially related to the bribery scheme described above. Jones has yet to be sentenced.

125. Former UAW International President Dennis Williams pleaded guilty on September 30, 2020 to one county of conspiracy to embezzle union funds, 18 U.S.C. Section 371, and is awaiting sentencing.

126. Some of the details of the bribery scheme, including the identities of some of the participants and the specific quid pro quos that were involved, have not yet become public through the criminal bribery cases and cannot currently be ascertained by plaintiff except through discovery.

127. Based on what has become public so far, for almost a decade, FCA, the UAW and the individual defendants, as well as others as yet unknown, engaged in a classic pattern of racketeering, including committing multiple violations of bribery, wire fraud and mail fraud statutes.

128. Companies that are party to a collective bargaining agreement have an obligation to follow the terms of the CBA.

Chrysler violated the terms of its CBAs in the ways enumerated above relative to the order of transfer and its implementation. These actions further constituted violations of the CBAs in that all such actions as they related to plaintiffs were motivated not by normal business practices but rather by bribes being paid to the union that represented plaintiffs, in violation of federal law.

129. Labor unions have an obligation to represent their members fairly; part of that duty of fair representation is the obligation by unions and their officials to deal honestly and truthfully with their members. The defendant union violated its duty of fair representation by withdrawing grievances against Chrysler when they knew that the grievances were valid. The defendant union further violated its duty of fair representation by withdrawing the grievances and by taking other actions and non-actions based not on what was best for its' members, but based on the fact that the union, through its high-level officials, had been taking bribes in order to help the company rather than union-members.

130. Chrysler continues to breach the respective CBAs and defendant UAW continues to breach its duty of fair representation owed to plaintiffs and these constitute continuing violations of the CBAs by Chrysler and the duty of fair representation by the UAW.

## COUNT I

## Civil RICO, 18 U.S.C. Section 1962(c) and (d) and 18 U.S.C.

Section 1964(a), (c) and (d)

131. Plaintiffs reassert the foregoing as if fully rewritten herein.

132. The conduct of all defendants, in authorizing, paying, collecting or concealing improper payments and/or bribes, and/or by impacting the collective bargaining and/or grievance processes, constitutes a pattern of racketeering activity. Each defendant, acting in concert with one or more of the other defendants, committed at least two acts of racketeering activity as identified above and in defendants' criminal charges, pleas and sentences; the multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, were long-running and in violation of 18 U.S.C. Section 1962 (c) and (d) and 18 U.S.C. Section 1964 (a), (c) and (d).

133. Plaintiffs' injuries and damages were directly and proximately caused by defendants' racketeering activities. As a direct and proximate result of defendants' activities, plaintiffs suffered and continue to suffer loss of income and loss of benefits, and other compensatory damages, for which the defendants, jointly and severally, are liable to plaintiffs for treble damages plus interest, punitive damages, attorneys' fees and costs.

COUNT II

Civil Conspiracy (Federal)

134. Plaintiffs reassert the foregoing as if fully rewritten

herein.

135. The conduct of all defendants, acting in concert with each other for the purpose of manipulating the collective bargaining and grievance processes, through concerted action to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means, constitutes a civil conspiracy, under federal law.

136. As a direct result of the actions and conduct of the defendants, plaintiffs suffered and continue to suffer loss of income, loss of benefits and other compensatory damages.

## COUNT III

### Civil Conspiracy (State of Michigan law)

137. Plaintiffs reassert the foregoing as if fully rewritten herein.

138. The conduct of all defendants, acting in concert with each other for the purpose of manipulating the collective bargaining and grievance processes, through concerted action to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means, constitutes a civil conspiracy, under Michigan law.

139. As a direct result of the actions and conduct of the defendants, plaintiffs suffered and continue to suffer loss of income, loss of benefits and other compensatory damages.

## COUNT IV

Chrysler--Breach of the Collective Bargaining Agreement

140. Plaintiffs reassert the foregoing as if fully rewritten herein.

141. The actions of Chrysler constitute violations of the Collective Bargaining Agreements, in that Chrysler improperly enacted and administered the transfer program, committed fraud and colluded with the UAW by bribing UAW officials, and in bribing UAW officials also violated the implied duty of good faith and fair dealing implicit in all collective bargaining agreements. These violations of the CBAs by Chrysler coupled with the UAW's violations of its duty of fair representation, constitute violations of Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185.

142. As a direct result of the actions and conduct of defendants Chrysler and UAW, plaintiffs suffered and continue to suffer loss of income, loss of benefits and other compensatory damages.

COUNT V

UAW–Violation of Duty of Fair Representation

143. Plaintiffs reassert the foregoing as if fully rewritten herein.

144. The actions and inaction of the defendant UAW, in the ways enumerated in Counts I,II,III and IV and elsewhere above, constitute violations of the UAW's duty of fair representation in violation of the UAW Constitution, as well as Section 9(a) of the

National Labor Relations Act, 29 U.S.C. Section 159, in conjunction with 28 U.S.C. Section 1337 (independent of the Hybrid Section 301 claim in Count IV).

145. As a direct result of the actions and conduct of the UAW, plaintiffs suffered and continue to suffer loss of income, loss of benefits, and other compensatory damages.

COUNT VI

Fraud (Michigan law)

146. Plaintiffs reassert the foregoing as if fully rewritten herein.

147. The actions and inactions of all defendants, jointly and severally, constitute common-law fraud under Michigan law in that the defendants knowingly and repeatedly made misrepresentations and concealments to plaintiffs regarding their job status and grievances, and withheld documents and information from plaintiffs during the grievance process, upon which plaintiffs relied to their detriment.

148. As a direct result of the actions and conduct of the defendants, plaintiffs suffered and continue to suffer loss of income, loss of benefits, and other compensatory damages.

WHEREFORE, plaintiffs ask that this court grant the following relief:

A. Declare that the acts and conduct of all defendants constitute violations of plaintiff's statutory and common-law rights;

B. Enjoin defendants from violating the statutory and common-law rights of the plaintiffs;

D. Grant to the plaintiffs and against all defendants, jointly and severally, an appropriate amount of compensatory damages, including treble damages;

E. Grant to the plaintiffs and against all defendants, jointly and severally, an appropriate amount of punitive and/or exemplary damages;

F. Grant to the plaintiffs and against all defendants, jointly and severally, appropriate costs and attorneys' fees.

G. Grant to the plaintiffs whatever other relief the Court deems appropriate.

/s/Kenneth D. Myers
KENNETH D. MYERS [0053655-Ohio]
6100 Oak Tree Blvd., Suite 200
Cleveland, OH 44131
(216) 241-3900
kdmy@aol.com

Counsel for All Plaintiffs

JURY DEMAND

Plaintiffs hereby demand a trial by jury.

/s/Kenneth D. Myers
KENNETH D. MYERS

Counsel for All Plaintiffs