IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN


|  |  |
|---|---|
| Thomas Baltrusaitis ) | Case No. 3:20-cv-12793 |
| Guillermo Antunez ) |  |
| Patrick Barth |  |
| Richard Broecker ) |  |
| Angela Bucher | JUDGE ROBERT CLELAND |
| Ryan Budek ) |  |
| William Byrwa |  |
| Tuyen Chu ) |  |
| Darryl Craig |  |
| Bill Davis ) |  |
| Satish Doshi |  |
| John Fletcher ) |  |
| Emory Gasperak |  |
| Jon Hutchinson ) |  |
| John Janssen |  |
| Alan R. Jarzembowski ) |  |
| Frank Kotsonis | AMENDED COMPLAINT |
| Sandra D. Lange ) | WITH JURY DEMAND |
| Arthur Laurin |  |
| Kevin Luczak ) |  |
| Gino J. Mangino |  |
| Tim Mauro-Vetter ) |  |
| Reginald McIntyre |  |
| Carl Oberndorfer ) |  |
| Jerome Peacock |  |
| Ejaz Rahman ) |  |
| Charlie Rickman |  |
| Mark Rosinski ) |  |
| Greg Ryntz |  |
| Michael Savosky ) |  |
| Brian Schiffman |  |
| Fred Schnell ) |  |
| Mark Skelly |  |
| Gregory Skonieczny ) |  |
| Lisa Sowinski |  |
| Suraj Tandon ) |  |
| Chance Tess |  |

1

```
Cahlos Tuitt
James Viriglio                    )
Ray Wan
Brian Warda                       )
Corey Watkins
Danny Woodruff                    )
Harold Wright
James A. Yarch                    )
Joan Zell
James Ziemianski                  )

                                  )

      Plaintiffs,                 )


                                  )
-vs-
                                  )

International Union United         )
Automobile, Aerospace and
Agricultural Implement            )
Workers of America
8000 East Jefferson Ave.          )
Detroit, MI  48214
                                  )
and
                                  )
FCA US, LLC
(formerly Chrysler Group, LLC)    )
1000 Chrysler Drive
Auburn Hills, MI  48326           )

and                               )

ALPHONS IACOBELLI                 )
1749 Picadilly Court
Rochester Hills, MI 48309         )

                                  )
and
                                  )
JEROME DURDEN                     )
761 Loggers Circle
Rochester, MI 48307               )
                                  )
and
                                  )
MICHAEL BROWN                     )
4402 Gateway Circle, Apt. 16      )
West Bloomfield, MI 48322
                                  )
```

2

and                                    )

DENNIS WILLIAMS                        )
24455 Crestley Dr.
Corona, CA 92883                       )

and                                    )

GARY JONES                             )
P.O Box 393
Corsicana, TX 75151                    )

and                                    )

NORWOOD H. JEWELL                      )
2296 Macscott Ct.
Swartz Creek, MI 48473                 )

and                                    )

VIRDELL KING                           )
15469 Ashton Rd.
Detroit, MI 48223                      )

and                                    )

NANCY A. JOHNSON                       )
5775 Lakeview Street
Detroit, MI 48213                      )

and                                    )

KEITH MICKENS                          )
16701 Woodingham Dr.
Detroit, MI 48221                      )

                                       )

JOHN DOE 1-10                          )

                                       )

        Defendants.                    )

<u>INTRODUCTION</u>

1.  This is a "civil RICO" and "hybrid 301" lawsuit filed by numerous employees and former employees of FCA US, LLC, who work or worked as engineers in Detroit and are or were members of the United Auto Workers union.  They are suing FCA, the UAW and several individual officials of both organizations for engaging in a pattern of racketeering by engaging in a bribery scheme to injure plaintiffs through loss of wages and benefits, and they are also suing FCA and the UAW for violations of federal labor laws. This Amended Complaint is being filed as of right.

2.  This lawsuit arises under 18 U.S.C. Section 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....", and 18 U.S.C. Section 1962 (d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

3.  This lawsuit is also being brought pursuant to Section 9(a) of the National Labor Relations Act, 29 U.S.C. Section 159(a), Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185, and 28 U.S.C. Section 1337.

4.  The NLRA/LMRA ("hybrid 301") part of this lawsuit is being brought within the six-month statute of limitations provided in 29 U.S.C. Section 160(b), considering that the statute of limitations

4

was tolled during the period when plaintiffs pursued internal union remedies, and was additionally tolled due to concealment and misrepresentation by the union defendants.  This Complaint is also brought pursuant to 29 U.S.C. Section 159(a) which does not have an administrative exhaustion requirement and does not have a six-month statute of limitations, and 18 U.S.C. Section 1962, which also does not have an administrative exhaustion requirement and which has a four-year statute of limitations.

5.  At all relevant times, each defendant was a "person" within the meaning of 18 U.S.C. Section 1961(3), because each defendant was "capable of holding a legal or beneficial interest in property."

6.  Defendants operated as, or participated in enterprises for the common purpose of directing funds away from FCA and others for the benefit of certain UAW officials in return for benefits, concessions and advantages to FCA as alleged herein, all to the detriment of plaintiffs. They did so by, among other things, illegally manipulating the collective bargaining and grievance processes and diverting funds from the National Training Center and other FCA funds for the benefit of UAW officials.

7.  Each defendant participated in the operation by making decisions on behalf of the enterprise and/or carrying out the decisions of the enterprise, including by directing, authorizing, receiving or concealing improper payments and/or by impacting the collective bargaining and/or grievance processes.  Each defendant committed at least two acts of racketeering activity as identified

below; the multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, and were long-running and therefore constitute a "pattern of racketeering activity."

## PARTIES

8. Plaintiffs are 47 current and former engineers employed by defendant FCA US LLC ("FCA") in the former Advance Manufacturing Engineering Powertrain (AMEPT) division, which is now known as the EMEC Department.  Currently plaintiffs work or worked at the Trenton Engine Complex (TEC) located in Trenton, Michigan.  They are members of Unit #25 and are represented by UAW Local 412.

9.  Defendant FCA US, LLC ("Chrysler") is the successor corporation to Chrysler Group, LLC, and is the employer of all plaintiffs.  FCA US, LLC means, collectively, FCA US, LLC, its parent FCA NV, along with their predecessors, including FCA predecessors, Chrysler LLC and Chrysler Group LLC and FCA NV predecessor Fiat S.p.A.  This defendant will be referenced as Chrysler or FCA. Defendant FCA is located in Auburn Hills, Michigan.

10.  Defendant UAW International is a labor organization and the bargaining representative of the employees of Chrysler, including plaintiffs.  Defendant UAW International is located in Detroit, Michigan.

11.  Defendants Iacobelli, Durden, Brown, Williams, Jones,

6

Jewell, King, Johnson and Mickens, along with John Does 1-10, were, at all relevant times, officials within either FCA or the UAW who were involved in the criminal conspiracy to defraud plaintiffs by engaging in a bribery scheme. The identities of the John Does could not reasonably be ascertained by plaintiffs but will be identified and properly served as appropriate.

<u>JURISDICTION AND VENUE</u>

12. This Court has federal question subject matter jurisdiction over this action under 28 U.S.C. Section 1331, and pursuant to the civil RICO statutes, 18 U.S.C. Sections 1962 and 1964 and pursuant to Section 9(a) of the National Labor Relations Act, 29 U.S.C. Section 159(a), Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185, and 29 U.S.C. Section 1337. This Court has subject matter jurisdiction over plaintiffs' state law claims as a matter of supplemental jurisdiction under 28 U.S.C. Section 1367.

13. Venue in this district is proper under 28 U.S.C. Section 1391 because a substantial part of the events and omissions giving rise to the claims occurred in this district, and under 18 U.S.C. Section 1965 because one or more of the defendants have an agent or transact their affairs in this district.

<u>FACTS</u>

14.   Plaintiffs are current and former engineers employed by FCA US LLC in the former Advance Manufacturing Engineering Powertrain (AMEPT)division, which is now known as the EMEC Department.   Currently plaintiffs who are still employed by FCA work at the Trenton Engine Complex (TEC) located in Trenton, Michigan or elsewhere in Michigan.   They are members of Unit #25 represented by UAW Local 412.

15.   On September 26, 2011, then-FCA Vice President of Employee Relations Alphons Iacobelli wrote a letter to then Vice President and Director-UAW Chrysler Department General Holiefield. Iacobelli's letter said that in accordance with Section 57 of the 2007 UAW-Chrysler Engineering Office and Clerical Agreement (the National Agreement), FCA intended to transfer the work performed by the AMEPT division at the Chrysler Technical Center (CTC) located at FCA's company headquarters in Auburn Hills, Michigan to the TEC in Trenton, Michigan.

16.   As a result, members of Local 412, Unit #53 would be transferred to UAW Local 412, Unit #25.   The letter indicated that Unit #53 would be transferred "in its entirety."   The transfer process was to begin by the end of the third quarter of 2011.   The letter cited a number of efficiencies it expected to realize as a result of the transfer of operations.

17.   Section 57 of the 2007 National Agreement, entitled "Transfer of Operations," provides that when operations are transferred from one represented seniority group to another, the

Company "will determine the number of additional employees, if any, the receiving seniority group will need to perform the transferred operations." Employees not wishing to transfer may exercise their seniority within their current seniority group. Section 57(b) requires that the Company provide notice and confer with the union regarding the advisability of transfer of employees impacted by the transfer of work. This was never done, in violation of the contract.

18. In the event the parties are unable to reach agreement, Section 57(c) sets forth default rules to govern the order in which employees are offered the opportunity to transfer. The 2007 National Agreement also contains a management rights clause which provides that the "Corporation has the exclusive right to manage its plants and offices and direct its affairs and working forces, except as limited by the terms of" the National Agreement.

19. The Company began the transfer of AMEPT operations in 2011. Plaintiffs were unhappy about the transfer because it added significant time to their daily commutes, approximately an hour each way, in addition to the increased fuel costs and vehicle wear and tear. Transferred employees also did not receive a relocation allowance because the National Agreement only provided for such payment when the transfer location was 50 or more miles away from the prior work location.

20. Soon after the transfer began, plaintiffs became aware that the transfer provisions of the collective bargaining agreement were being violated; other employees within their unit were

continuing to work out of the CTC, only rarely reporting to the TEC in Trenton, if at all.  Most of the AMEPT management employees continued to work almost exclusively from the CTC. Some supervisors and some engineers would find excuses to report to the CTC or simply "camp out" in conference rooms with the explicit or tacit approval of their managers, who also preferred working from the CTC.  In some instances, employees within the transfer group would work from the offices of suppliers located near the CTC to avoid commuting to Trenton.  Plaintiffs believed it was unfair that some employees, most of whom lived a short distance from the Auburn Hills headquarters, were being required to report to Trenton, more than  50 miles away, while others continued to work primarily from the CTC or nearby locations, especially since those who avoided the long commute to Trenton had more time available to work overtime assignments.

21.  As early as 2012, plaintiffs complained to the Company's Human Resources department about the uneven treatment of employees within the transferred unit and that the transferred employees should have received a relocation allowance.  At various points, the Company committed to enforcing the transfer equally, even agreeing to cancel badge access to the CTC for employees in the transfer group.  However, by information and belief, the Company never acted on this matter.

22.  Plaintiffs were also unhappy with the use of pool cars located at the CTC.  Transferred employees preferred to use pool cars located at the CTC for weekend overtime assignments at nearby

10

plants.  Some managers permitted Trenton-based employees to use the
CTC pool cars while others would not allow the practice.   In
addition, some employees used the CTC pool cars even during the
work week in order to avoid reporting to Trenton.  The issue of the
location and access to pool cars was raised by the union during
local contract negotiations in 2013, but no resolution was reached.

23.   In addition, as early as 2013, plaintiffs and others
noticed what they believed to be an increase in the number of non-
bargaining unit (NBU) employees doing bargaining unit work.  They
attributed this increase to the transfer. The number of salaried
bargaining unit (SBU) employees within the AMEPT group decreased as
a result of the long commute to Trenton and low morale attributable
to unequal implementation of the transfer.

24.  In 2014, the Company formed the "Advanced Planning Group"
at CTC, also referred to as the "Strategic Planning Group."  Non-
bargaining unit employees in this group began to perform work
traditionally performed by plaintiffs, and plaintiffs filed several
grievances relating to the Advanced Planning Group in 2014 and
2015.

25.  Between 2012 and 2015,union leadership was not responsive
to concerns raised by plaintiffs relative to the transfers.  Unit
#25 took company-friendly positions on a number of issues.
Specifically, the then-existing Unit leadership ignored plaintiffs'
concerns regarding the erosion of the SBU workforce and the
reassignment of work to NBU employees.  Grievances were not
properly handled, few grievances were actually presented at the

11

first step, none were presented at the second step and many grievances filed prior to the transfer were withdrawn without precedent (WWP) by union officials with no documentation or explanation.   By information and belief, prior local union leadership enjoyed privileges such as increased access to overtime as a result of their acquiescence to management in union matters.

26.   In June, 2015, new leadership took office for Unit #25. In the same month, the National Negotiating Term reached out to the new unit leadership to determine what issues from the group should be forwarded in the national negotiating process.   Several grievances regarding the transfer of work to the Advanced Planning Group were submitted to the National Negotiating Team, but there was no disposition to the grievances nor any accounting for this issue in the new collective bargaining agreement.

27.   In 2015, plaintiffs filed grievance 15-25-001 regarding the 2011 transfer of operations.   That grievance sought payment of $30,000 for each affected employee under the National Agreement's Relocation Allowance Plan.   This grievance was not pursued by the union beyond the second step.

28.   On August 2, 2017, plaintiffs filed grievance 17-25-001, on behalf of all employees in the transferred group.   The grievance claimed a violation of the "Purpose and Intent" of the National Agreement.   The grievance stated:

> The entire EMEC SBU workforce has been damaged
> with the illegal 'Transfer of Operations' that
> took place back on November 11th, 2011.   FCA
> colluded with the UAW and created the illegal
> Transfer of Operations [which] was executed by
> the company with the full support of corrupt

> UAW officials.  The collusion between FCA and
> the UAW not only violated Labor Law, it has
> damaged all SBU employees of EMEC....
> After the AMEPT SBU engineers were forced to
> move due to the Transfer of Operations,
> management created the 'Strategic Planning
> Group' in the area that was vacated by the AME
> PT engineers.  Now NBU employees are doing
> traditional EMEC SBU engineering work.

29.   The grievance sought $172,800 payable to 55 EMEC

employees to compensate for additional daily commuting time, as

well as a $45,000 car voucher per employee to compensate for added

mileage placed on their vehicles.  The grievance also requested

that employees be relocated back to CTC and the return of all work

traditionally performed by SBU employees.

30.   The allegations of collusion contained in the grievance

were based on the government's indictment of Alphons Iacobelli on

July 26, 2017 for violation of federal labor law and tax evasion.

31.   As the Public Review Board stated:

> The essence of Appellants' claim is that the
> Company avoided complying with its contractual
> obligations by unlawfully obtaining the
> acquiescence of certain Union officers and as
> a result deprived the Appellants of the
> benefit of these contractual provisions.  Such
> a claim states a contract violation.
> **********
> Iacobelli's indictment and subsequent plea
> agreement indicate that illicit payments to
> Holiefield and others occurred during the time
> period relevant to the transfer.
> Significantly, the Company provided notice of
> the transfer in a letter from Iacobelli to
> Holiefield.  It may be that this letter was
> signed and addressed by these men in their
> official capacities and that they had no
> personal involvement in matters related to the
> transfer.  But at this point, there is nothing
> in the Record to establish who was involved in
> the transfer on behalf of the Company and the

13

> Union.  Under the circumstances as currently
> known, it does not seem improbable that
> Iacobelli and Holiefield were personally
> involved.  The transfer involved a substantial
> number of employees, approximately 200.  The
> Company also announced the transfer just as
> negotiations for the 2011 National Agreement
> were wrapping up, when presumably principals
> on both sides were in frequent contact.
>
> Appellants' allegation that fraud or
> collusion tainted the transfer of operations
> is also bolstered by the evidence that they
> have presented indicating that the Company did
> not transfer Appellants' unit "in its
> entirety," as initially announced.  The Record
> materials submitted by Appellants clearly
> indicate that many management employees and
> even some SBU employees continued to work at
> CTC....the fact that NBU employees and others
> did not actually transfer lends credence to
> Appellants' claim based on Iacobelli's plea
> agreement that the transfer was the product of
> fraud and collusion, as opposed to a bona fide
> operational change motivated by considerations
> of efficiency.
>
> Public Review Board Decision, January 22, 2020
> at 16, 17-18.

32.   The indictment of Iacobelli was the first public acknowledgment by either FCA, the UAW or the federal government, that the government was investigating anyone in FCA and/or the UAW for what would later blossom into a scandal in which it was revealed that from about 2009 until the Iacobelli indictment was made public in 2017, high-level FCA officials had been paying bribes to UAW officials in exchange for the UAW negotiating company-friendly contracts and acting in the company's interests on grievances. It was also the first information plaintiffs had that their complaints and grievances had been affected by bribery between FCA and the UAW.

33.   The Company answered that the grievance was untimely because the transfer occurred in 2011 and that it lacked merit because the transfer was conducted in accordance with the National Agreement.  Plaintiff Baltrusaitis progressed the grievance to Step 2, but the Company gave the same response and also asserted that the grievance was the same as the one filed in 2015.

34.   At the next stage in the process, UAW Region 1 International Representative Thomas Brenner withdrew the grievance. Plaintiffs were notified of the withdrawal by letter dated November 3, 2017.

35.   On December 8, 2017, plaintiffs filed an appeal with the International President, which was ruled untimely. Plaintiffs did not seek to appeal the International President's determination regarding timeliness.

36.   On February 2, 2018, plaintiffs filed grievance 18-25-001, on behalf of all employees in the transferred group. The grievance claimed a violation of the "Purpose and Intent" clause of the National Agreement.  The grievance stated:

> The EMEC SBU workforce has been damaged by the actions of an FCA executive who violated the Labor Management Relations Act and who also paid off UAW official(s) 'to take company-friendly policies.' One such policy was the 'Transfer of Operations' that took place back on November 11th, 2011.    FCA illegally influenced UAW officials(s) with monies, which led to the questionable Transfer of Operations of Unit #53 from CTC to Unit #25 at TEC. After the AME PT SBU engineers were forced to move due to the Transfer of Operations, management created the 'Strategic Planning Group' in the area that was vacated by the AME PT engineers. Now NBU employees are doing traditional SBU engineering work, work once done by SBU Unit

15

> #53 engineers.  The illegal actions of the FCA
> executive was verified in January-2018 when
> news articles came out saying that the
> executive pled guilty to criminal charges....

37.  The grievance sought essentially the same relief as grievance 17-25-001.

38.  The Company answered that the grievance was similar to 17-26-001, which had been withdrawn, and also lacked a contractual basis.

39.  Unit #25 forwarded the grievance to UAW Region 1 and a Step 2 grievance meeting was held on August 7, 2018.  By letter dated August 27, 2018, International Representative Brenner advised Unit #25 that the grievance had been withdrawn.

40.  On September 24, 2018 the plaintiffs appealed the withdrawal of grievance 18-25-001.  In support of their appeal, plaintiffs submitted voluminous documentation to the International UAW.  Plaintiffs emphasized that on December 15, 2017, Iacobelli had pled guilty to providing prohibited payments to Holiefield, whereas the allegations of collusion in grievance 17-25-001 had been based solely on the government indictment of Iacobelli.

41.  On February 7, 2019, the International Executive Board rejected plaintiffs' appeal.

42.  On February 24, 2019, plaintiffs appealed the withdrawal of the grievance to the UAW's Public Review Board, the last step in UAW's internal appeal process.

43.  On December 14, 2019, the PRB held oral argument.

44.  On January 22, 2020, the PRB issued a ruling which stated that plaintiffs "have made a sufficient showing that fraud or

collusion could have impacted the 2011 transfer of operations to warrant further investigation," and ordered the UAW to provide additional documentation and information concerning the union's defenses to the plaintiffs' claims that fraud and collusion affected the 2011 transfer decision and the implementation of that decision.

45.   On May 6, 2020, the PRB issued a final ruling.  That ruling said that the UAW's response to the PRB's request for additional information "fails to provide sufficient information to rebut Appellants' threshold showing in this matter." The PRB declared that plaintiffs had "discharged their obligation to exhaust internal union remedies under Article 33, Section 5 of the UAW International Constitution" and "may proceed with any external processes or remedies available to them."

46.   Unbeknownst to plaintiffs at the time when plaintiffs were transferred in 2011, or when they complained to the company about uneven implementation of the transfer process in 2012, or when they complained repeatedly to their union leadership, or when they watched as grievances were not properly handled, or when they filed a grievance in 2015, high-level officials at Chrysler and the UAW were engaging in a wide-ranging, long-lasting criminal bribery scheme aimed at saving Chrysler millions of dollars by having the union take company-friendly positions, i.e., interpreting contractual language in a way that deprived Chrysler employees, like plaintiffs, of fair representation and derailing the exact type of grievances that plaintiffs were attempting to bring.

17

47.   Beginning in January, 2009, FCA began this scheme of improper payments to UAW officials, funneled through the Chrysler-UAW National Training Center (NTC), made by FCA senior executives and agents including with the knowledge and approval of then-FCA CEO Sergio Marchionne (now deceased).  All such payments were made willfully and with the intent to benefit the UAW and its officials to influence the collective bargaining and/or grievance processes, as alleged herein.

48.   Also unbeknownst to plaintiffs at the time they complained to union officials and filed their grievances, the United States Attorney for the Eastern District of Michigan, the FBI and the United States Department of Labor were conducting an investigation into corruption by and between Chrysler and the UAW.

49.   This investigation was first revealed when the first of numerous indictments and plea agreements were publicly revealed in July, 2017, but the fact that UAW and FCA officials had engaged in a bribery scheme was known to FCA and UAW officials as early as 2009, when the scheme began. The fact that the bribery was being criminally investigated was known to FCA and UAW no later than June, 2015 (See Exhibit K) and was concealed from the plaintiffs and downplayed by union officials through 2018 (See Exhibit K).

50.  According to indictments and plea agreements filed in the bribery scandal criminal cases, starting in approximately July, 2009, Chrysler paid millions of dollars in "prohibited payments and things of value to UAW officers and UAW employees" through the UAW-FCA joint training center and in return, received "benefits,

18

concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."

51. These payments were "viewed...as an investment in 'relationship building' with UAW Vice President [General] Holiefield," according to the indictment of Alphons Iacobelli, the Vice President of Employee Relations at Chrysler at the time of the bribery scandal. <u>U.S. v. Iacobelli</u>, E.D. Mich., Case No. 17-20406, Docket #4 at 13. See Iacobelli indictment, attached as Exhibit A.

52. On January 22, 2018, Iacobelli pleaded guilty to paying $1.5 million in bribes to several UAW officials in exchange for those officials going easy on the company in union contracts and grievances. This guilty plea, along with guilty pleas by several UAW officials, is part of an ongoing FBI and U.S. Department of Labor corruption investigation of the "big three" automakers and the UAW, corruption that has potentially victimized tens of thousands of innocent UAW members, including the plaintiffs in this case.

53. Specifically, Iacobelli pleaded guilty to criminal charges involving conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371. Iacobelli was the Vice President for Employee Relations at FCA. In that capacity, he was "FCA's lead representative for labor relations and had lead responsibility for managing FCA's relationship with the UAW. Alphons Iacobelli was the senior FCA official responsible for negotiating with the UAW and for administering the collective

bargaining agreements between FCA and the UAW, including the resolution of disputes and grievances that arose under the collective bargaining agreements between FCA and the UAW," according to his plea agreement.

54.  Iacobelli admitted that "[b]etween in or before January 2009 and continuing through in or after June 2015, Alphons Iacobelli knowingly and voluntarily joined a conspiracy in which Fiat Chrysler Automobiles US LLC and its executives agreed to pay and deliver, and willfully paid and delivered, more than $1.5 million in prohibited payments and things of value to officers and employees of the UAW." U.S. v. Iacobelli, Plea Agreement at 3. See Iacobelli plea agreement, attached as Exhibit B.

55.  These bribes were authorized by FCA's then CEO Sergio Marchionne (now deceased) to General Holiefield, the UAW Vice President and International Executive Board Member (now deceased) who oversaw the FCA business relationship.  FCA executive Iacobelli has admitted to this scheme and currently is in prison for these illegal acts.  Michael Brown, Director of Employee Relations at FCA and Co-Director of the National Training Center, likewise has admitted to this scheme.

56.  According to the plea agreement, over the course of the conspiracy, Iacobelli, along with an unnamed FCA Director, an unnamed FCA Senior Manager, FCA Financial Analyst Jerome Durden and other FCA executives and employees, unlawfully paid and delivered more than $1.5 million in prohibited payments and things of value directly and indirectly to UAW Vice President General Holifield,

UAW Assistant Director Virdell King, three unnamed UAW officials "and other UAW officials." <u>U.S. v. Iacobelli</u>, Docket #58, Iacobelli Plea Agreement at 6.  See Exhibit B.

57.  Those payments and things of value included paying off the mortgage on the personal residence of a UAW Vice President, personal travel, designer clothing, cases of custom-labeled wine, furniture, jewelry, and custom-made watches.  Iacobelli Plea Agreement at 6.  See Exhibit B. These and other payments described in the plea agreement were delivered to UAW officials and UAW employees "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW."  Plea Agreement at 7.  See Exhibit B.

58.  According to the Iacoballi indictment, FCA and its executives, with the knowledge and approval of FCA, made these payments to keep UAW officials "fat, dumb, and happy" and to "buy labor peace."  Iacobelli Indictment at 16.  See Exhibit A.

59. According to federal prosecutors, "FCA, through Iacobelli and its executives, was implementing a corporate policy to buy good relationships with UAW officials.  As one FCA executive put it, FCA was making an 'investment,' by 'spending thousands here,' in the form of illegal payments to UAW officials through the National Training Center, in an effort to obtain benefits, concessions, and advantages for FCA in its relationship with the UAW."  Iacobelli Gov't Sentencing Mem., Docket #132 at 8. See Iacobelli Sentencing Memorandum, attached as Exhibit C.

60.   As Michael Brown, FCA's Director of Employee Relations and NTC Co-Director admitted, "it was the intent of FCA executives to 'grease the skids' in their relationship with UAW officials." Brown Plea Agreement, at 4.   See Brown Plea Agreement, attached as Exhibit D.

61.   To minimize detection of the payments, FCA had the NTC provide the bribes to various UAW officials through a variety of deceptive means and methods.   The bribes violated the Taft-Hartley Act, 29 U.S.C. Section 186 (a) and (b), all constituting predicate acts of racketeering within the meaning of 18 U.S.C. Section 1961(1).

62.   For example, UAW Vice President Holifield used his personal charity, Leave the Light on Foundation (LTLOF), as one means to conceal his receipt of FCA bribes.   Between July, 2009 and 2014, Holiefield and his hand-selected LTLOF board members (which included defendant FCA executive Jerome Durden and defendants UAW officials Keith Mickens and Virdell King) transferred more than $386,000 in funds from the NTC to LTLOF.   Holiefield and his team hid these transfers by improperly omitting them from the Form 990s the NTC and LTLOF filed with the IRS. In turn Holiefield, along with his girlfriend (and later wife), Monica Morgan, used the purported charitable donations for personal expenditures.

63.   On other occasions, the NTC would directly pay the personal expenses of certain UAW officials, such as a wire transfer from the NTC that paid off the mortgage on Holiefield's personal residence in the amount of $262,219.71.

64.    FCA also made use of credit cards issued to UAW officials, with statements sent through the U.S. mails and payments made in part using interstate wires, so that UAW officials could charge personal expenses that were paid by FCA.    Iacobelli "directed the NTC to follow 'liberal' credit card and expense policies to persuade union officials to take company-friendly positions," according to the Virdell King Information (at 11). See Virdell King Information, attached as Exhibit E.

65.    By information and belief, among the "company-friendly positions" that the UAW and its officials took in exchange for receiving bribes from FCA was the UAW's allowance, with no resistance, of the transfer of plaintiffs from Auburn Hills to Trenton, the lax and uneven enforcement of the transfer based on favortism toward certain employees, the handling of plaintiffs' complains and grievances, failure to take any action when non-bargaining unit employees took work from bargaining-unit members such as plaintiffs and the failure to take any action when the transfers were administered unfairly.

66.    Defendant Norwood Jewell was a member of the UAW Executive Board from 2011 to 2017, most recently as UAW's vice president of the FCA Department beginning in June, 2014 until 2017 and previously as a Regional Director (2010-2014), and co-chair of the National Training Center.

67.    By information and belief, under Jewell's leadership, the UAW withdrew, ignored or short-shrifted plaintiffs' grievances and complaints about the transfers, the use of non-bargaining unit

23

employees and the uneven administration of the transfers, based on the fact that Jewell and other UAW officials were taking bribes from FCA at the time plaintiffs' issues were pending.

68.   Jewell later admitted under oath that between 2014 and 2016 he joined the conspiracy whereby UAW officials accepted things of value from FCA executives acting in the interest of FCA.  He admitted that as part of that conspiracy, executives from FCA made prohibited payments of things of value, including travel, lodging and meals, delivered through and concealed by the National Training Center, with the intent to benefit the UAW, other senior UAW officials or himself when the UAW, the other UAW officials and Jewell were not lawfully allowed to accept such things of value under the Labor Management Relations Act.

69.   Jewell admitted in his Plea Agreement that between 2009 and 2016, during which time General Holiefield (2009-2014) and he (2014-2016) were the vice presidents of the UAW in charge of the Chrysler Department,

> FCA executives conspired with one another, with FCA, with officials at the UAW, and with the UAW, to violate the Labor Management Relations Act....[They] knowingly created and/or joined the conspiracy whereby officers and employees of the UAW would willfully request, receive and accept money and things of value from persons acting in the interest of FCA. During the Holiefield leadership years, a 'culture of corruption' was continued and enhanced between Holiefield, his staff, and executives of FCA to violate the Labor Management Relations Act....From 2014 through 2016, while serving as a vice president of the UAW in charge of the Chrysler Department, Norwood Jewell knowingly joined the conspiracy whereby officers and employees of the UAW would willfully request, receive and accept

24

things of value worth over $40,000 from
persons acting in the interest of FCA by
failing to apportion the amounts attributable
to the UAW, the NTC, and to Norwood Jewell
personally.   The things of value included
travel, lodging and meals....Norwood Jewell,
then a representative, officer and vice
president of the UAW, knowingly and
voluntarily joined this conspiracy to receive
things of value from persons acting in the
interest of FCA. Norwood Jewell joined knowing
that the prohibited payments of things of
value, which were delivered through and
concealed by the UAW-Chrysler National
Training Center (NTC), were willfully made
with the intent to benefit the UAW, Norwood
Jewell, senior UAW official Nancy A. Johnson,
senior UAW official Virdell King, Keith
Mickens, and other senior UAW officials, who
were not permitted to receive things of value.

U.S. v. Jewell, E.D. Mich. Case No. 2:19-cr-
20146, Docket #10, Rule 11 Plea Agreement at
2-4. See Jewell Plea Agreement, attached as
Exhibit F.

70.  According to the United States Attorney's Sentencing
Memorandum in Jewell's case, Jewell "made the conscious and
criminal decision to participate in the conspiracy and to bask in
the culture of corruption."  See Jewell Sentencing Memorandum,
attached as Exhibit G.

71.  Norwood Jewell pleaded guilty to one count of conspiracy
to violate the Labor Management Relations Act, in violation of 18
U.S.C. Section 371, and was sentenced to fifteen (15) months in
prison in 2019. The overt acts for which he pleaded guilty were
occurring at the exact same time that he was overseeing the union's
response to plaintiffs' issues stemming from the transfer.

72.  In reality he was accepting bribes at that time, the

purpose of which was to do FCA's bidding in regards to grievance handling and contract negotiations, rather than doing the bidding of plaintiffs and other UAW members.

73.   The issues raised by plaintiffs, which UAW officials encouraged plaintiffs to bring to the attention of UAW bargaining unit officials, never became a part of the 2015 CBA and, by information and belief, were not even raised by the UAW bargaining committee to FCA during negotiations.   This was all in furtherance of the bribery scheme and the pattern of racketeering to which Jewell and other UAW officials were parties.

74.   In the meantime, on July 14, 2015, at the kickoff of the 2015 CBA negotiations, Jewell used a National Training Center credit card, paid for by FCA, to pay more than $7500 for an extravagant meal at a Detroit restaurant for himself and the UAW national negotiating committee. That same day, Jewell caused another $800 of FCA money to be spent for UAW officials to smoke cigars and drink liquor at the same restaurant.

75.   In September, 2015, after the completion of the 2015 CBA negotiations, at which plaintiffs' transfer issues were not raised, Jewell caused another $7000 or so of FCA money to be spent at the same Detroit restaurant for Jewell and the UAW negotiating team to celebrate the new CBA with FCA.   During the time period of 2014-2016, when the UAW was looking the other way on plaintiffs' grievances and complaints and fighting them at every step in their attempts to have their grievances heard and remediated, Jewell was continuing the "culture of corruption" started by Holiefield by

accepting bribes from FCA, and funneling meals, travel, alcohol and other things of value to other UAW officials, all to the detriment of plaintiffs and as part of the conspiracy by FCA and UAW and their officials to benefit FCA at the direct expense of plaintiffs, who were the intended targets of the scheme.

76.  Jewell further enriched himself with FCA money, with FCA's knowledge and encouragement, when he repeatedly used a credit card and funds provided to him as Co-Chairman of th NTC to make extravagant purchases for the benefit of himself and other high-ranking UAW officials, in violation of 29 U.S.C. Section 186.

77.  Such purchases included $8,926.93 for a two-month stay at a villa in Palm Springs, California in January and February, 2016; $6,681.12 for golf, golf club rentals, golf balls, meals, beer, and liquor at the Indian Canyons Golf Resort in Palm Springs; $1,259.17 for luxury luggage; $2,182 for an Italian-made Baretta shotgun; and $468.86 for cigars at Wild Bill's Tobacco store.  These purchases also included $2,130 of Disney World theme park tickets for his friend and his friend's family; multiple tickets to Universal Studios theme park for his friends at a cost of $217.26 each; and numerous extravagant dinners for himself and other UAW officials.

78.  FCA not only bought the acquiescence of individual UAW officials like Holiefield and Jewell; FCA also bought the entire UAW International Executive Board at a time when the IEB and/or individual members of the IEB, had the opportunity to make judgments on plaintiffs' grievances or the procedural aftermath of those grievances.

79.   For example, in August, 2014, during the time plaintiffs were complaining to the union and to the company about the transfers, the uneven enforcement of the transfers and the increase in the use of non-bargaining unit employees doing plaintiffs' work, Jewell hosted two lavish parties on the grounds of the National Training Center.

80.   Jewell caused more than $25,000 of FCA money to be used for a decadent party to entertain the members of the IEB, including Regional Directors, other Vice Presidents and then-UAW president Dennis Williams, who was the individual ultimately responsible for the actions taken by the UAW that went against plaintiffs' interests.

81.   During that party, each attendee received personalized bottles of wine, with a label that read, "MADE ESPECIALLY FOR YOU BY UAW VICE PRESIDENT NORWOOD JEWELL IN THE USA." These bottles of wine, as well as other costs of the party, were paid for by FCA.

82.   In August, 2015, which was after plaintiffs had filed their grievance, Jewell hosted another party for the IEB on FCA's tab. This party was even more lavish than the 2014 party and had a "Miami Vice" theme and cost more than $31,000.  This party featured "Kandy Girls," who were dressed in provocative outfits and whose role was to light the cigars of UAW bosses.

83.   As the U.S. Attorney said in Jewell's sentencing memorandum:

> Jewell accepted money generously supplied by
> the car company with whom he was negotiating a
> collective bargaining agreement that would
> affect the wages, benefits, and working

28

conditions of tens of thousands of workers.
Rather than conduct those negotiations at
arm's length, Jewell's arms were reaching
towards the deep pockets of Fiat
Chrysler....Jewell was not focused on
zealously representing the interests of UAW
members and their families. Instead, while
thousands of UAW members worked hard every day
at factories, Jewell was living the absolute
high life in Palm Springs for extended periods
of time in January and February of 2015 and
2016. Jewell golfed during the day and ate
prime steaks at top restaurants during the
night, all while living in a three-bedroom
villa with a private pool and hot tub. Of
course, Jewell's high-flying lifestyle was
paid for by Fiat Chrysler with money funneled
through the National Training Center. Jewell
also used Fiat Chrysler money to send his
close friends to Disney World, fly first
class, and acquire brand new luggage. As for
the UAW members on the factory lines across
the country, their day-to-day concerns and
grievances were far from Jewell's mind.

U.S. v. Jewell, E.D. Mich. Case No. 2:19-cr-
20146, Docket #15, Government Sentencing
Memorandum at 15-16. See Exhibit G.

84. It was during this exact time frame that Jewell was
presiding over the withdrawal of hundreds of union grievances,
including plaintiffs' grievance and taking other company-friendly
positions in exchange for the afore-mentioned bribes.

85. In between golf outings in Palm Springs and lavish
parties in Detroit, during which time he was bought and paid for by
Chrysler, Jewell oversaw the continuation of the culture of
corruption started by General Holiefield. and then ran off to have
his cigar lit by a Kandy Girl.

86. The same can be said of the other defendants and of the
other bargaining issues affected by the bribes. As the U.S.

Attorney said in Jewell's Sentencing Memorandum: "These men and women believed that their union leaders were looking out for their best interests and negotiating in good faith, not double dealing them for personal gain.  Through their involvement in this criminal conspiracy, however, Jewell and other senior UAW leaders were accepting corrupt payments from Fiat Chrysler and its executives. It is difficult to calculate the harm that resulted to the grievance process, the bargaining process, and labor relations generally." U.S. v. Jewell, Govt. Sentencing Memorandum at 17. See Exhibit G.

87.  The plea agreement of Iacobelli acknowledges that his involvement in the bribery conspiracy lasted until June, 2015, by which time defendant UAW was in the process of burying plaintiffs' first grievance.

88.  Moreover, the Jewell plea agreement acknowledges that the bribery conspiracy lasted until the end of 2016, and other evidence indicates the bribery conspiracy lasted well into 2017, by which time plaintiffs had been complaining about the transfer and its aftermath for several years without knowing of the existence of a bribery conspiracy or a federal investigation into said conspiracy; and defendant UAW had already withdrawn plaintiffs' 2015 grievance without mentioning that high-level UAW and FCA officials had been engaged in a bribery scandal that may have affected the union's handling of plaintiffs' claims.

89.  Plaintiffs' complaints and grievances were either pending or had been dismissed or withdrawn, during the time UAW officials

knew about the bribery scheme and knew about the federal bribery investigation and yet failed to notify plaintiffs of a bribery scheme or a pending federal bribery investigation that would have affected plaintiffs' case.

90.  Throughout the time frame of 2013-2017, when plaintiffs were complaining to company and union officials and filing grievances, throughout all of these events over a four-year period, the defendants failed to disclose that the union's positions relative to plaintiffs' claims were, at least in part, purchased through and/or influenced by bribes.  The ongoing concealments were part and parcel of the defendants' ongoing conspiracy and racketeering enterprise and constituted breaches of CBAs (for the company) and violations of the union's duty of fair representation.

91.  As a result of these bribes, the union defendants were compromised and were never in a position to fully and fairly represent plaintiffs' interests as they were legally required to do, and plaintiffs were not able to receive the benefit of the true and honest union representation to which they were entitled.

92.  Moreover, by virtue of the fact that the bribery scheme was intended to save FCA money and has, at least to this point, been successful at doing so,  and that the money saved came at the expense of the plaintiffs, who have been deprived of their rightful benefits,  plaintiffs were the primary targets of the illegal bribery scheme and the bribery scheme was the proximate cause of plaintiffs' losses.

93.  Each and every one of the defendants participated in or

had knowledge of the bribery scheme and/or the federal investigation into the bribery scheme and therefore are responsible as co-conspirators. Each of the individual defendants has admitted to having knowledge of and/or participation in the bribery scheme.

94. As the U.S. Attorney's office said in the Sentencing Memorandum of Nancy Johnson, Norwood Jewell's top administrative assistant, who pleaded guilty to one count of conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371: "Instead of zealously pursuing union grievances and health and safety issues, senior officials of the UAW sought to line their own pockets with money and things of value provided to them by Fiat Chrysler." See Johnson Sentencing Memorandum, attached as Exhibit H.

95. At every stage of plaintiffs' case, when both the UAW and Chrysler were making decisions that were adverse to plaintiffs, Chrysler was paying and the UAW was accepting bribes to assure that the UAW would take "company friendly positions," which is exactly what happened to plaintiffs. Each of the defendants, both the corporate defendants and the individual defendants, took part in or knew about the bribery scheme and its goal of inducing the union to take company-friendly positions on CBA negotiations and the handling of grievances.

96. During the time frame of plaintiffs' grievances and appeals, the International Presidents of the UAW were Dennis Williams and then Gary Jones.

32

97.  Williams was UAW President from 2014 to June, 2018 and he was replaced by Jones, who was president from June, 2018 to November, 2019.

98.  On June, 2, 2020, Jones pleaded guilty to racketeering and embezzlement charges, and is awaiting sentencing.  On September 30, 2020, Williams pleaded guilty to a single count of conspiracy to embezzle union funds, in violation of 18 U.S.C. Section 371. He is awaiting sentencing.

99.  According to the indictment of UAW official Vance Pearson, Williams was directly involved in the bribery conspiracy, in that he rented a villa in Palm Springs, California, ostensibly for the UAW's Region 5 Conference, from on or about December 25, 2014 to January 31, 2015.  During that time, upon information and belief, Williams participated in or was aware of Chrysler/FCA funds being used for lavish dinners and golf outings for UAW officials in Palm  Springs, including dinners and other expenditures during January, 2015.  See Vance Pearson Criminal Complaint, attached as Exhibit I.

100.  In June, 2018, Gary Jones took over as union president and was the UAW official who, on February 7, 2019 and February 20, 2019, after the plea agreements of Iacobelli and others had already become public, and after the resignation of Williams in light of the ongoing bribery scandal, refused to permit plaintiffs to proceed with their appeal of the UAW's withdrawal of their grievances. Jones was also UAW international President throughout part of the plaintiffs' appeal to the Public Review Board, in which

the union opposed plaintiffs' claims.  By information and belief,
Jones' decision on behalf of the union to oppose plaintiffs' claims
and not to reveal to plaintiffs the existence or details of the
bribery scheme and/or the federal investigation into the bribery
scheme, was influenced by his knowledge of, and participation in
the bribery scheme.

101.  During the entire time frame between 2013 and 2018,
high-level officials from both the UAW and FCA, acting on behalf of
their respective organizations, knew that bribes were being paid
and received or had previously been paid and received in order to
obtain labor peace, at the expense of plaintiffs and other UAW
members.

102.  During this same time frame and even later, both FCA and
the UAW knew that the plaintiffs had been wrongfully transferred
and pushed out of their positions.

103.  It was the UAW International President (Gary Jones and
Dennis Williams) and the International Executive Board of the UAW
that had signed off on the refusal to hear plaintiffs' appeals to
the President, to the International Executive Board and then to the
Public Review Board from 2017-2020.

104.  Almost all of these events occurred during the same time
period when FCA was paying bribes to the UAW to buy labor peace and
to influence labor contracts and grievances or in the aftermath of
UAW officials having received those payments, when defendants knew
they were under investigation by the federal government and failed
to disclose it to plaintiffs.  Plaintiffs, among others, were the

intended targets of the bribery scheme.   Some of these events occurred after FCA and the UAW were informed that their organizations and high-level individuals within their organizations were under investigation for bribery.   Yet, as part of the conspiracy, neither FCA nor the UAW nor any of the individual defendants informed plaintiffs of the investigation or that the actions of FCA and the UAW in fighting plaintiffs' claims for the last eight years had been influenced by payments and acceptance of bribes.

105.   As a direct result of this conspiracy of silence, plaintiffs, in addition to having been unlawfully transferred, were not able to fully and fairly pursue either their grievance or the withdrawal of their grievances, to plaintiffs' detriment and prejudice.

106.   As the Public Review Board said in its ruling:

> The [Iacobelli] plea agreement was an admission that Iacobelli had engaged in criminal conduct, specifically that he had caused unlawful payments to be made to certain UAW officials, most notably General Holiefield.   The plea agreement identifies numerous 'overt acts' involving hundreds of thousands of dollars in payments or things of value to Holiefield or his girlfriend (later wife) between 2009 and 2011-2012, which were made or authorized by Iacobelli.   The plea agreement further states that these and other prohibited payments and things of value were delivered in an effort to obtain 'benefits, concessions, and advantages for FCA in its negotiation, implementation and administration of the collective bargaining agreements' with the UAW for 2011 and 2015.

> The essence of Appellants' grievance 18-25-001 is that the 2011 transfer of operations was either the product of or tainted by

> Iacobelli's criminal conduct. Appellants cannot be considered reasonably aware of the existence of such a claim until Iacobelli's guilty plea was made public. Indeed, until that point, Iacobelli and others had concealed and denied the criminal conduct to which he ultimately confessed.
>
> Public Review Board Decision, January 22, 2020 at 13.

107. UAW and FCA leaders knew as early as June, 2015, that the federal government was actively investigating past FCA/UAW CBAs and labor agreements. See Exhibit K. Plaintiffs had no such knowledge because FCA, UAW and its leaders, as part of the conspiracy, concealed from the plaintiffs both the fact of the bribes and the fact that the union and the company and high-level officials from the union and the company were being investigated. All of the union's actions and the company's actions in the transfer and its aftermath are tainted by the bribery scandal.

108. Even though plaintiffs disagreed with the decisions made by the UAW in relation to their claims, they reasonably but incorrectly believed that FCA and the UAW and their officials acted in good faith and at arm's length.

109. Secrecy and concealment of the bribery scheme were vital to its' success. Had defendants revealed the existence of the bribery scheme to plaintiffs (or to anyone), it would have resulted in criminal indictments much earlier than was eventually the case, and it would have afforded plaintiffs the opportunity to have more fully explored the extent to which the bribes were influencing the defendants' decisions in the internal union procedures.

36

110.   Instead, defendants, as part of the conspiracy, took active measures to conceal the existence of the bribes, including but not limited to, failing to reveal the existence of the bribery scheme and the federal investigation into the bribery scheme during all phases of plaintiffs' complaints, both informal and formal. This ongoing conspiracy of concealment was successful, in that plaintiffs went through the initial grievance process and internal appeals before the first public acknowledgment was made by the federal government (not the defendants) of the existence of the bribery investigation and scheme.

111.   Even when the first federal indictments were made public in July, 2017, FCA and the UAW continued to take active steps to conceal and minimize the scheme.   In 2017 and 2018, FCA and UAW President Williams issued public statements downplaying the federal indictments, claiming the bribes had no effect on the collective bargaining process and attributing the bribes to a few "bad actors."   See Williams statement, July 26, 2017, attached as Exhibit J; FCA statement, July 26, 2017, attached as Exhibit K; FCA CEO Sergio Marchionne statement expressing "disgust" over the bribery scheme, July 27, 2017, attached as Exhibit L; Williams letter, August 1, 2017, attached as Exhibit M; Williams letter, January 26, 2018, attached as Exhibit N; FCA and UAW statement, August 27, 2018, attached as Exhibit O.

112.   The public statements of UAW and FCA continued to claim through at least August, 2018,  that FCA and UAW were victims and that neither the company nor the union knew of or sanctioned the

criminal acts alleged and further, that the illegal conduct of these "bad actors" had nothing to do with the collective bargaining process.

113.  In fact, both UAW and FCA had been aware of the criminal acts, both because their highest-level executives were participating in the conspiracies and because by July, 2017, both the company and the union had known about the federal investigations for at least two years prior to the announcement of the first set of indictments in July, 2017.  And both FCA and the UAW knew that the bribes had a direct effect on the collective bargaining process, including the handling of plaintiffs' transfer and grievances, because that was what the bribes were specifically intended to affect.

114.  Plaintiffs could not have reasonably discovered this information earlier, because of defendants' ongoing effort to conceal the existence of the bribery scheme.

115.  The withdrawal of the grievances, which saved the company millions of dollars, is just the kind of company-friendly positions that the Iacobelli bribes were intended to purchase.

116.  By information and belief, the withdrawing of plaintiffs' grievances, as well as the union's on-going attempts to thwart plaintiffs' attempts to seek redress through union procedures, was done for corrupt purposes as part of the conspiracy that began in 2009.

117.  Since the Iacobelli plea agreement was made public, numerous other FCA and UAW officials have been indicted and/or

pleaded guilty to charges stemming from the same or other bribery schemes.

118. For example, Jerome Durden, who was a financial analyst at Chrysler and FCA and who was Controller of the NTC and Secretary of the NTC Joint Activities Board and Treasurer of General Holiefield's Leave the Light on Foundation until 2015, pleaded guilty on August 8, 2018 to failure to file tax returns, 26 U.S.C. Section 7203, and conspiracy to defraud the U.S., 18 U.S.C. Section 371 for acts related to the bribery scheme, and was sentenced to 15 months in prison.

119. Michael Brown was the Director of Employee Relations at Chrysler and FCA from 2009 to 2016. In that capacity, by information and belief, Brown was personally involved in the negotiations and administration of the national CBAs between FCA and the UAW and had authority to sign letters and agreements on behalf of FCA with the UAW. Brown also represented FCA as Co-Director of the NTC. On May 25, 2018, Brown pleaded guilty to misprision of a felony, 18 U.S.C. Section 4 for his role in the bribery scheme, and was sentenced to one year and one day in prison.

120. Norwood Jewell served on the UAW's executive board from 2011 to 2017, including serving as UAW's Vice President of the FCA Department from 2014-2017. He also served as Co-Chairman of the NTC. On April 2, 2019, Jewell pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for his role in the bribery scheme and was sentenced to fifteen

(15) months in prison.

121.   Virdell King was a senior official in the UAW Chrysler Department from 2008 until she retired in February, 2016.   On August 29, 2017, she pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for her role in the bribery scheme and was sentenced to sixty (60) days in prison.

122.   Nancy Johnson was the top administrative assistant to Norwood Jewell when Jewell was the UAW Vice President for the Chrysler Department, from 2014-2016.   On July 23, 2018, Johnson pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 371 for her role in the bribery scheme, and was sentenced to one year and one day in prison.

123.   Keith Mickens was a senior official in the UAW Chrysler Department from 2010 through 2015.   Mickens served as Co-Chairman of the NTC and served on the NTC Joint Activities Board.   On April 5, 2018, Mickens pleaded guilty to conspiracy to violate the Labor Management Relations Act, 18 U.S.C. Section 271 for his role in the bribery scheme, and was sentenced to one year and one day in prison.

124.   Former UAW International President Gary Jones pleaded guilty on June 3, 2020 to one count of conspiracy to embezzle union funds and to use facilities of interstate commerce to aid racketeering activity, and  conspiracy to defraud the United States, in an embezzlement scheme that is only partially related to the bribery scheme described above.   Jones has yet to be sentenced.

125.    Former UAW International President Dennis Williams pleaded guilty on September 30, 2020 to one count of conspiracy to embezzle union funds, 18 U.S.C. Section 371, and is awaiting sentencing.

126.    Some of the details of the bribery scheme, including the identities of some of the participants and the specific quid pro quos that were involved, have not yet become public through the criminal bribery cases and cannot currently be ascertained by plaintiff except through discovery.

127.    Based on what has become public so far, for almost a decade, FCA, the UAW and the individual defendants, as well as others as yet unknown, engaged in a classic pattern of racketeering, including committing multiple violations of bribery, wire fraud and mail fraud statutes.

128.    Companies that are party to a collective bargaining agreement have an obligation to follow the terms of the CBA. Chrysler violated the terms of its CBAs in the ways enumerated above relative to the order of transfer and its implementation. These actions further constituted violations of the CBAs in that all such actions as they related to plaintiffs were motivated not by normal business practices but rather by bribes being paid to the union that represented plaintiffs, in violation of federal law.

129.    Labor unions have an obligation to represent their members fairly; part of that duty of fair representation is the obligation by unions and their officials to deal honestly and truthfully with their members. The defendant union violated its

duty of fair representation by withdrawing grievances against Chrysler when they knew that the grievances were valid. The defendant union further violated its duty of fair representation by withdrawing the grievances and by taking other actions and non-actions based not on what was best for it's members, but based on the fact that the union, through its high-level officials, had been taking bribes in order to help the company rather than union-members.

130. Chrysler continues to breach the respective CBAs and defendant UAW continues to breach its duty of fair representation owed to plaintiffs and these constitute continuing violations of the CBAs by Chrysler and the duty of fair representation by the UAW.

## COUNT I

## Violation of RICO, 18 U.S.C. Section 1962(c)

### (All defendants)

131. Plaintiffs reassert the foregoing as if fully rewritten herein.

132. Each plaintiff is an individual and a person as defined in 18 U.S.C. Section 1961(3) and 1964(c). Each defendant is a person as defined in 18 U.S.C. Section 1964(c).

### I. The Applicable Statutes

133. Under 18 U.S.C. Section 1962(c) it shall be unlawful for "any person employed by or associated with an enterprise engaged

in, or the activities of which affect, interstate or foreign commerce to conduct or participate directly or indirectly in the conduct of such enterprise's affairs for a pattern of racketeering activity or collection of unlawful debt." And, under 18 U.S.C. Section 1962(d), it shall be unlawful to conspire to violate any of the RICO substantive provisions, including Section 1962(c).

134.   Federal RICO, specifically 18 U.S.C. Section 1964(c), creates a private right of action for any person injured in his business or property by reason of violation of Section 1962 and provides for threefold the damages sustained, as well as recovery for the cost of suit including reasonable attorney fees.

## II. The Enterprises

### A.  The National Training Center (NTC)

135.   The NTC itself is a 'legal entity' enterprise as described in 18 U.S.C. Section 1961(4) as it was a Michigan tax-exempt corporation with its principal place of business in Detroit, Michigan.  The NTC was formed under the terms of CBAs between the UAW and Chrysler.  The stated purpose of the NTC is to provide for the education, training and retraining of UAW workers employed by FCA.  The NTC is governed by the Joint Activities Board, with the Vice-President of Employee Relations of FCA (Iacobelli); and the Vice-President of UAW's Chrysler Department serving as Co-Chairman of the Board (deceased non-party General Holiefield, succeeded by defendant Jewell).  The remainder of the Board was made up of senior officials from FCA and the UAW.

136.  As alleged herein, FCA and its officials made illegal payments to UAW officials, defendants herein, through the NTC, in an effort to obtain benefits, concessions and advantages for FCA in its relationship with the UAW. See para. 59. These payments constituted illegal payments in violation of 29 U.S.C. Section 186(a) (payors) and (b) (receivers), which is predicate activity as described in 18 U.S.C. Section 1961(1)(c) (dealing with restriction on payments and loans to labor organizations).

137.  Each defendant conducted the affairs of the NTC, i.e., the named defendants operated the NTC for the purpose of directing funds from the NTC to certain UAW leaders.  In particular:

(a) FCA (and some of its top executives, described further below) willingly, purposefully, and unlawfully used the NTC as a vehicle to bribe union officials, funneling millions of dollars through the NTC for the benefit of certain union leaders in violation of the Taft-Hartley act.  (See also para. 66-70; Jewell Plea Agreement, Exhibit F herein).  According to government prosecutors, the NTC "sits at the epicenter of a massive conspiracy to corrupt the labor management process..." See General Motors, LLC v. FCA US LLC, et al., E.D. Mich. Case No. 2:19-cv-13429, ECF 1, Complaint, p. 19, fn 7. FCA funded the NTC pursuant to a formula set forth in the CBAs negotiated between FCA and the UAW;

(b) the UAW, through its senior officers, including its former UAW International President Gary Jones (para. 124) and preceding former President Dennis Williams (para. 97, 99) knowingly received large amounts of monies from the NTC to directly benefit certain

senior UAW leaders, who knew the funds were impermissible to receive from FCA;

(c) individual defendants had authority regarding the operation and conduct of the affairs of the NTC; see Iacobelli, (para. 51-56) who was employed aa the vice-president of Employee Relations at FCA and served as Co-Chairman of the NTC and Joint Activities Board; Michael Brown (para. 55, 119), Director of Employee Relations at FCA and Co-Director of the NTC; Jerome Durden (para.118), controller of the NTC and Secretary of the NTC Joint Activities Board; Norwood Jewell (para. 66-72, 120), UAW's vice-president of the FCA and Co-Chairman of the NTC; Keith Mickens (para. 123), Co-Chairman of the NTC and member of the NTC Joint Activities Board.

138. Each of these defendants participated in the use of NTC funds impermissibly, taking steps to conceal the payments to UAW leaders, and directly approving the impermissible payments. Through these actions, each of these defendants made decisions on behalf of the NTC, by determining what payment should be permitted to which UAW official, and/or carried out the decisions of the NTC by making or approving such payments. These payments were part of a coordinated and systematic scheme stretching back nearly a decade. These defendants thus operated the NTC through numerous racketeering acts, as described herein.

139. The affairs of the NTC affected interstate commerce as it provided training programs for UAW members located in different states and conducted its normal, ongoing business affairs in

interstate commerce, such as the purchase of supplies and equipment made in different states.

### B.  Association in Fact Enterprise-NTC

140.  The NTC was governed by a Joint Activities Board headed by senior FCA and UAW officials, with the remainder of the Board also made up of senior officials from FCA and the UAW.  The NTC is sponsored by defendants FCA and UAW.   Thus, the NTC also constituted an "association in fact" enterprise as described in 18 U.S.C. Section 1961(4) comprised of entities and individuals which included most defendants named above as well as others.   The NTC functioned not only to provide training programs but was used to enrich the enterprise's members and associates through the diversion of funds from the NTC to the benefit of UAW officials. The defendant persons controlling the NTC (FCA, UAW and Joint Board) operated with a consensual decision-making process and had a common purpose, i.e., to use the NTC as a mechanism to illegally manipulate the collective bargaining process and divert funds for the benefit of UAW officials.  The NTC officials impermissibly used the NTC to funnel monies to UAW senior officials and took steps to conceal these payments thus having relationships sufficient to pursue the purpose.  The enterprise had longevity, as it existed for many years.

141.  The defendants who operated and controlled the NTC banded together to commit violations which they could not accomplish on their own and thus they were cumulatively conducting

46

the affairs of the association in fact NTC.  The NTC enterprise, an association in fact of entities and individuals has a structure separate and apart from the pattern of racketeering activity, i.e., bribe-giving in violation of the Taft-Hartley Act, in which each defendant engaged.  Each defendant itself is and was distinct from an association in fact of individuals and entities constituting the NTC association in fact enterprise.  The affairs of the NTC affect interstate commerce as it provided training programs for UAW members located in different states and conducted its normal, ongoing business affairs in interstate commerce, such as the purchase of supplies and equipment made in different states.

### C.  Association in Fact Enterprise - Defendants and Others

142.  The third alternative enterprise consisted of an association in fact enterprise comprised of the individual defendants and legal entity defendants, FCA and UAW, associated together, along with others not named as defendants, e.g., non-defendant FCA officials acting pursuant to the direction of senior FCA management, as described in 18 U.S.C. Section 1961(4).  These members and associates of this enterprise functioned together as a continuing unit, i.e., each played a distinct coordinated role to allow for the direction of funds from the NTC to certain UAW leaders who knew the funds were illegally received.  The members and associates had a consensual decision-making process as they functioned together on the Joint Boards, and had a 'common purpose,' i.e., to use the NTC as a mechanism to illegally

manipulate the collective bargaining process and divert funds for the benefit of UAW officials in return for more favorable labor negotiations. The enterprise members and associates banded together to commit violations which they could not accomplish on their own and thus they were cumulatively conducting the affairs of the association in fact enterprise, not their respective own affairs. Enterprise members and associates also had 'relationships,' i.e., FCA and its senior management impermissibly used the NTC to funnel monies to UAW senior officials who knowingly took steps impermissibly to receive these payments.  The enterprise also had longevity sufficient for the RICO defendants to pursue the enterprises's purpose as it stretched for nearly a decade.

143. Each defendant conducted the affairs of the enterprise as they had at least 'some direction' in the operation of the enterprise, i.e., enterprise members FCA and senior management coordinated to direct funds from the NTC to UAW to ultimately benefit in labor negotiations, and enterprise members UAW and certain senior management willingly received these monies knowing that it was impermissible to so receive such monies.  The association in fact of an individual and legal entities, has a structure separate and apart from the pattern of racketeering activity, i.e., bribe-giving in violation of the Taft-Hartley Act, in which each defendant engaged.  Each defendant itself is and was distinct from an association in fact of individuals and entities constituting the association in fact enterprise.

144.  The activities of the enterprise affected interstate

commerce in that it provided services to UAW members located in different states and used goods and services which travel in interstate commerce.   The enterprise also affected interstate commerce based on defendants' unlawfully obtaining, transmitting, billing and collecting monies through use of interstate wirings, in furtherance of the racketeering scheme as alleged in the Complaint.

### III.   Racketeering Violations

145.   From at least 2009 through 2018, the RICO defendants described herein, i.e., FCA, UAW and individual defendants, wee each employed by or associated with the enterprises described above, and knowingly and intentionally conducted or participated in, directly or indirectly, the conduct of such enterprises' affairs through a pattern of racketeering activity, all in violation of 18 U.S.C. Section 1962(c). The racketeering activity consisted of the predicate acts of labor bribery as set forth below.   The fraudulent schemes also involved using the interstate wires to conceal the illicit activity. (See para. 63, NTC paying direct expenses of certain UAW officials through wire transfers; para 64, FCA issuing credit cards to UAW officials.  But wire fraud and mail fraud predicates are not alleged at this juncture, as further discovery is needed to provide the 'particularity' needed to allege these offenses.)

146.   Predicate Acts - 29 U.S.C. Section 186(a) and (b)

Section 186(a) provides:

> It shall be unlawful for any employer or association of employers or any person who

49

acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value -

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

Section 186(b)(1) provides: "It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a)."

147.   Each individual FCA defendant has pleaded guilty to federal criminal violations regarding their activity in funneling monies through the NTC for the benefit of UAW officials. See para. 117-125. Plaintiffs allege that FCA and certain senior management, defendant Iacobelli (Vice-president of Employee Relations at FCA and Co-Chairman of the NTC and its Joint Activities Board from 2008

to 2015); defendant Durden (controller of the NTC and Secretary of the NTC Joint Activities Board from 2008 to 2015); defendant Brown (director of employee relations at FCA from 2009 to 2016 and Co-Director of the NTC) were alleged to have committed violations of Section 186(a) by causing the prohibited payments and things of value from FCA through the NTC for the benefit of UAW officials. These allegation are based on the evidence in the criminal prosecutions, including plea agreements and sentencing memoranda, wherein FCA and these FCA senior officials all admitted to facts sufficient to show they violated Section 186(a)(1) and (2) and (a)(4) by virtue of causing the making of illegal payments to UAW officials described herein. See, e.g., para. 56 (Durden); para. 56-59 (Iacobelli admissions to payments); para 60 (Brown admissions).

148. Consistent with the above federal charges, as alleged above, the UAW and certain senior management, Norwood Jewell (para. 120), UAW's vice-president of the FCA department and Co-Chairman of the NTC; Keith Mickens (para. 123), Co-Chairman of the NTC who served on the NTC Joint Activities Board; Gary Jones (para. 124), former UAW International President; Dennis Williams (para. 99), former UAW International President; Virdell King (para. 121), senior official in the UAW Chrysler Department from 2008 to 2016, all violated Section 186(b)(1), by virtue of receiving and/or causing the receipt of illegal payments from the FCA through the NTC. Each UAW individual defendant (except Williams to date) has also pleaded guilty to federal criminal violations regarding their

activity in funneling monies through the NTC for the benefit of UAW officials.   (See para. 119-127.) Similar to the FCA defendants, these defendants have pleaded to overt acts in plea agreements and other documents sufficient to allege they committed Section 186(a) and (b) violations, See e.g., para. 69-72 (admissions in plea agreement of overt acts by Jewell).

### IV.  Pattern of Racketeering Activity

149.  Plaintiffs allege that the course of conduct engaged in by the RICO defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. Section 1961(5).  Plaintiffs can show the relatedness prong because the predicate acts have the "similar purposes, results, participants, or methods of commission or are related to the affairs of the enterprise."  All predicate acts had the same purpose of directing funds away from the FCA and others for the benefit of certain UAW officials in return for benefits, concessions, and advantages to FCA in collective bargaining.

150.  Plaintiffs allege that the continuity of the pattern of racketeering activity constitutes closed-ended continuity as it occurred over a substantial period of time, i.e., from about July, 2009 through the year 2018.

### V. Injury

151.  As a direct and proximate result of the defendants'

predicate acts, in furtherance of violating 18 U.S.C. Section 1962(c), plaintiffs were injured in their business or property. Specifically, it is alleged that the compromising of certain UAW leaders by the defendants' illegal manipulation of the collective bargaining and grievance process, directly caused plaintiffs' monetary losses in the form of additional uncompensated time on the job and wear and tear on their cars as a result of the unlawful relocation of plaintiffs.  Plaintiffs also assert that during the time of the bribery scheme and government investigations, the very exact type of grievances and lawsuit that plaintiffs were trying to bring, wsd "derailed" because of the bribery scheme.

152.  Plaintiffs also assert that the FCA officials involved in the bribery scandal were the very persons who were responsible for administering collective bargaining agreements between FCA and the UAW, including the resolution of disputes and grievances that arose under the agreement.  Plaintiffs assert that among the "company-friendly positions" that the UAW and its officials took in exchange for receiving bribes was UAW's handling of plaintiffs' complaints and grievances about relocation.  These "company-friendly positions" included the actual relocation order in 2011, which violated the terms of the then-existing CBA (para. 15-20), and the UAW's handling the appeal of plaintiffs' initial grievance in 2015 (para. 27), plaintiffs' 2017 grievance (para. 28), 2018 grievance (para. 36) and the entirety of plaintiffs' complaints about the relocation matter (para. 33-45).  Norwood Jewell, UAW's vice-president and member of the UAW Executive Board from 2011-

2017, who pleaded guilty as described herein, see para. 68-69, is alleged in 2015, while the bribery scheme was in full swing and Jewell himself was receiving things of value exceeding $40,000, to have made decisions regarding plaintiffs' complaints and grievances. The overt acts to which he pleaded guilty were at the exact same time that Jewell was overseeing the handling of plaintiffs' complaints and grievances regarding the relocation matter.

153.  Plaintiffs also note that in Jewell's sentencing memo Jewwll was "not focused on zealously representing the interests of UAW members and their families." Para. 83.  See also para. 86, wherein the government wrote that as a result of the bribery scandal "it is difficult to calculate the harm that resulted to the grievance process, the bargaining process and labor relations generally."  See Exhibit G at 17.  Plaintiffs assert that the compromised position of union officials involved in the issues relevant to plaintiffs' grievances continued through at least 2017.

## VI.  Proximate Causation

154.  Plaintiffs and other UAW-represented FCA employees were the primary and immediate targets of the illegal bribery scheme, and thus the payments in violation of Section 186 were the proximate and direct cause of plaintiffs' losses.  Para. 92. Plaintiffs assert that at every stage of plaintiffs' case, when both the UAW and Chrysler (FCA) were making decisions that were adverse  to plaintiffs, FCA was paying and the UAW was accepting

bribes to assure that the UAW would take "company friendly positions," which is exactly what happened to plaintiffs. It is alleged that each of the defendants, both the corporate defendants and the individual defendants, took part in the bribery scheme and its goal of inducing the union to take "company friendly positions" on CBA negotiations and the handling of grievances. See para.95.

155. Plaintiffs assert there is some direct relation between the injury asserted (e.g., the loss of monies and benefits as a result of the compromised UAW officials in connection with grievances) and the injurious conduct alleged (the bribes to UAW officials). Plaintiffs assert that it was a foreseeable and natural consequence that the bribery scheme would result in injury to Chrysler/FCA employees represented by the UAW, such as plaintiffs, in the 2015 labor negotiations. (See Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 658 (2008) (finding "direct result" when it found that "it was a foreseeable and natural consequence" that the scheme would cause injury to the plaintiffs.)) Moreover, under the "directness" factors cited in Holmes v. SIPC, 503 U.S. 258 (1992), monetary losses resulting from the compromised grievance process would not be too difficult to ascertain as it is arguable that union members are 'immediate victims' when racketeering bribes are paid to their union to secure advantages for the bribe payor/employer at their expense. Further, there is little risk of multiple recoveries by different persons, such as competitors who have been ruled to not be proximately injured, and thus little risk of duplicative or overlapping

injuries.

### VII.  Statute of Limitations

156.   In the Sixth Circuit, the statute of limitations on a RICO case begins to run "when a party knew, or through the exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation." Sims v. Ohio Cas. Ins. Co., 151 F. App'x 433, 435 (6th Cir. 2005), cited in Hood v. United States Postal Serv., 2017 U.S. App. LEXIS 20047 at *5 (6th Cir. 2017). While "plaintiffs need not be aware of every minute fact underlying their RICO claims," they must be "presented with evidence suggesting the possibility of fraud." Sims, *supra*, at 436. "[T]he injury discovery rule requires not only that the plaintiff know of his injury, but also that the plaintiff know the source of his injury." Grange Mut. Cas. Co. v. Mack, 2009 WL 1036092 at *6 (E.D. Ky., 2009) (citing Rotella v. Wood, 528 U.S. 549, 556-57 (2000)). Where the parties "disagree about when plaintiff did or should have discovered its RICO cause of action against defendant and thus when plaintiff's injury occurred," the court "cannot consider this question of fact" at the pleading stage.  Munson Hardisty, LLC v. Legacy Pointe Apartments, LLC, 359 F.Supp. 3d 546, 566 (E.D. Tenn. 2019).

157.   Plaintiffs did not discover, and could not have discovered with reasonable diligence, the existence of a RICO violation, until, at the earliest, July, 2017, when the first RICO allegations, against Iacobelli, became public.   Even then,

Iacobelli denied the allegations until January, 2018, when he pleaded guilty. The fact that plaintiffs could not have discovered the RICO violations until the indictments and plea agreements became public precludes dismissal at the pleading stage. <u>Fremont Reorganizing Corp. v. Duke</u>, 811 F. Supp. 2d 1323,1340 (E.D. Mich. 2011). Thus, plaintiffs' complaint, filed in October, 2020, is well within the four-year RICO statute of limitations.

### VIII.   Fraudulent Concealment

158.  Even if plaintiffs' claims accrued before October, 2016 (four years prior to the Complaint being filed), plaintiffs' complaint is timely based on defendants' fraudulent concealment.

159.  Fraudulent concealment consists of three element: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of the cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." <u>Carrier Corp. V. Outokumpu Oyj</u>, 673 F.3d 430, 446 (6th Cir. 2013). Plaintiffs set forth facts showing the defendants' extraordinary and ongoing efforts to conceal their misconduct. Plaintiff set forth facts showing they did not discover the RICO violations until the indictments and plea agreements became public. Plaintiffs set forth facts showing their due diligence in prosecuting their case (the lengthy grievance and internal union appeal process) both before and after discovering the RICO scheme. Plaintiffs allege that defendants took affirmative steps to conceal the bribery

conduct at all stages of plaintiffs' complaints and grievances, see para. 109-112, as secrecy and concealment of the bribery scheme was vital to its success. During the course of the bribery scheme, defendants affirmatively concealed the scheme by, among other things, using the NTC credit card accounts and bank accounts of NTC to funnel payments from FCA to UAW officers and employees; using false-front companies and charitable organizations run by UAW officials to secretly funnel money to other members of the conspiracy for personal use; filing false tax returns to conceal illegal bribe payments; falsely filling out union documents in order to be reimbursed for expenses. It is further alleged that even when the first federal indictments were made public in July, 2017, FCA and the UAW continued to take active steps to conceal and minimize the scheme. See para. 111-113, and Exhibits J,K,L,M,N,O, i.e., defendants taking affirmative steps to conceal the scheme as late as August, 2018, when FCA and UAW President Williams issued public statements downplaying the federal indictments and attributing the bribes to a few bad actors.

160.  The overall FCA-UAW bribery scheme was inherently self-concealing, as secrecy was essential to perpetuate the scheme.  Had the illegal payments been exposed, the conspirators would have been investigated and prosecuted criminally at an earlier stage, bringing the scheme to a close.

161.  Plaintiffs further assert that even in the exercise of due diligence, plaintiffs could not have reasonably discovered this information earlier, because of defendants' ongoing effort to

conceal the existence of the bribery scheme through at least the end of 2018 and even later, due to defendants' continued denial and downplaying of the scheme.

162.   Had plaintiffs filed a civil RICO lawsuit any time between 2011 and 2017, before the existence of the bribery scheme was known, the lawsuit would have been dismissed, since the plaintiffs would not have been able to plead even the basic elements of a RICO claim. It would be inequitable to force plaintiffs to file a lawsuit based on claims they did not even know existed, and that defendants were intentionally concealing in hopes of "running out the clock" on plaintiffs' civil RICO claims. Defendants were operating several racketeering enterprises, keeping the existence of the enterprises concealed from plaintiffs and should not now be heard to complain that plaintiffs did not discover the schemes and did not file their claims soon enough. It took the FBI and the U.S. Department of Labor six years from the onset of the scheme to begin investigating, and it took the U.S. Department of Justice at least two years after the investigations began to file the first criminal charges; it would be inequitable to require plaintiffs, a group of engineers, to have investigated and discovered enough evidence to have filed a RICO suit prior to the first criminal convictions.

163.  Defendants' fraudulent concealment has equitably tolled the statute of limitations and the statute did not begin to run until July, 2017, when the Iacobelli indictment became public, or January, 2018, when the Iacobelli plea agreement made the RICO

scheme clear. Thus, the filing of this Complaint on October 16, 2020 was well within the four-year tolled civil RICO statute of limitations. Even if there is a question as to whether the statute of limitations is equitably tolled, that issue should not be decided on the pleadings. <u>Venture Glob. Eng'g, LLC v. Satyam Computer Servs., Ltd.</u>, 730 F.3d 580, 589 (6th Cir., 2013).

**COUNT II**

**Violation of RICO Conspiracy - 18 U.S.C. Section 1962(d)**

**(All defendants)**

164. Plaintiffs reassert the foregoing as if fully rewritten herein.

165. Plaintiffs allege that commencing in early 2009 and continuing until 2018, the RICO defendants described above conspired to violate section 1962(c), i.e., each defendant agreed that a conspirator would conduct or participate in the affairs of the enterprise through a pattern of racketeering, consisting of acts indictable under 29 U.S.C. Section 186(a) and (b), as more fully described in Count I. Plaintiffs allege that the conspiratorisl objective of that mutual agreement was to direct funds away from FCA and others for the benefit of certain UAW officials in return for benefits, concessions and advantages to FCA as alleged herein, coincident in time with the plaintiffs' stalled grievance process with the UAW. The direct result of this illicit bribery agreement impacted the UAW's handling of collective bargaining and grievances, all causing direct and proximate injury

to the plaintiffs.

166.   The nature of the above-described acts, omissions and concealment of such scheme, as outlined above, all in furtherance of the conspiracy, gives rise to an inference that defendants not only agreed to the objective of an 18 U.S.C. Section 1962(d) violation of RICO by conspiring to violation 18 U.S.C. Section 1962(c), but were aware that their long-running bribery scheme had been and is a part of an overall pattern of racketeering activity.

## COUNT III

### Civil Conspiracy (Federal)

**(All defendants)**

167.   Plaintiffs reassert the foregoing as if fully rewritten herein.

168.   The conduct of all defendants, acting in concert with each other for the purpose of manipulating the collective bargaining and grievance processes, through concerted action to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means, constitutes a civil conspiracy, under federal law.

169.   As a direct result of the actions and conduct of the defendants, plaintiffs suffered and continue to suffer loss of pay and other job benefits, and other compensatory damages.

## COUNT IV

## Civil Conspiracy (State of Michigan law)

### (All defendants)

170.   Plaintiffs reassert the foregoing as if fully rewritten herein.

171.   The conduct of all defendants, acting in concert with each other for the purpose of manipulating the collective bargaining and grievance processes, through concerted action to accomplish a criminal or unlawful purpose and/or to accomplish a lawful purpose by criminal or unlawful means, constitutes a civil conspiracy, under Michigan law.

172.   As a direct result of the actions and conduct of the defendants, plaintiffs suffered and continue to suffer loss of income, loss of benefits and other compensatory damages.


## COUNT V

### Breach of the Collective Bargaining Agreement

### 29 U.S.C. Section 185

### (Chrysler (FCA))

173.   Plaintiffs reassert the foregoing as if fully rewritten herein.

174.   The actions of Chrysler (FCA) constitute violations of the Collective Bargaining Agreements, in that Chrysler improperly enacted and administered the transfer program, committed fraud and colluded with the UAW by bribing UAW officials, and in bribing UAW officials also violated the implied duty of good faith and fair dealing implicit in all collective bargaining agreements. These

62

violations of the CBAs by Chrysler coupled with the UAW's violations of its duty of fair representation by accepting bribes, constitute violations of Section 301 of the Labor Management Relations Act, 29 U.S.C. Section 185.

175. As a direct result of the actions and conduct of defendants Chrysler and UAW, plaintiffs suffered and continue to suffer loss of income, loss of benefits and other compensatory damages.

## COUNT VI

## Violation of Duty of Fair Representation

## 29 U.S.C. Section 159

## (UAW)

176. Plaintiffs reassert the foregoing as if fully rewritten herein.

177. The actions and inaction of the defendant UAW, in the ways enumerated above, including but not limited to UAW's involvement in the bribery scheme and the concealment of the bribery scheme and the federal investigation into the bribery scheme during times when plaintiffs' complaints, grievances and appeals were pending, constitute violations of the UAW's duty of fair representation in violation of the UAW Constitution, as well as Section 9(a) of the National Labor Relations Act, 29 U.S.C. Section 159, in conjunction with 28 U.S.C. Section 1337 (independent of the Hybrid Section 301 claim in Count IV).

178. As a direct result of the actions and conduct of the

UAW, plaintiffs suffered and continue to suffer loss of income, loss of benefits, and other compensatory damages.

## COUNT VII

### Fraud (Michigan law)

#### (All defendants)

179. Plaintiffs reassert the foregoing as if fully rewritten herein.

180. The actions and inactions of all defendants, jointly and severally, constitute common-law fraud under Michigan law in that the defendants knowingly and repeatedly made misrepresentations and concealments to plaintiffs regarding the real reasons for their relocations and regarding the status of their complaints and grievances, including withholding information from plaintiffs during the grievance process, upon which plaintiffs relied to their detriment.

181. As a direct result of the actions and conduct of the defendants, plaintiffs suffered and continue to suffer loss of income, loss of benefits, and other compensatory damages.


WHEREFORE, plaintiffs ask that this court grant the following relief:

    A. Declare that the acts and conduct of all defendants constitute violations of plaintiffs' statutory and common-law rights;

    B. Enjoin defendants from violating the

statutory and common-law rights of the plaintiffs;

C.  Grant to the plaintiffs and against all defendants, jointly and severally, an appropriate amount of compensatory damages, including treble damages;

D.  Grant to the plaintiffs and against all defendants, jointly and severally, an appropriate amount of punitive and/or exemplary damages;

E.  Grant to the plaintiffs and against all defendants, jointly and severally, appropriate costs and attorneys' fees.

F.  Grant to the plaintiffs whatever other relief the Court deems appropriate.


Respectfully submitted,

/s/Kenneth D. Myers
KENNETH D. MYERS [0053655-Ohio]
6100 Oak Tree Blvd., Suite 200
Cleveland, OH 44131
(216) 241-3900
(440) 498-8239   Fax
Kdmy@aol.com

Counsel for all plaintiffs

65

JURY DEMAND

Plaintiffs hereby demand a trial by jury.

/s/Kenneth D. Myers
KENNETH D. MYERS

Counsel for all plaintiffs

CERTIFICATE OF SERVICE

The foregoing has been sent, via electronic and regular mail, postage pre-paid, to counsel for all defendants (where known) and to the remaining defendants (where counsel is not known), on this 10th day of January, 2021.

/s/Kenneth D. Myers
KENNETH D. MYERS

Counsel for all plaintiffs